No. 20,167.

SAMUEL C. KANZIUS et al. v. E. N. JENKINS et al. (THE WESTERN CASUALTY & GUARANTY INSURANCE COMPANY, *Appellant and Appellee;* THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BARTON, *Appellee and Appellant*).

### SYLLABUS BY THE COURT.

1. BRIDGE CONTRACTS—*Breach by Contractor—Indemnity Bond—Liability of Surety Company.* A construction company contracted with county commissioners to build and repair a number of bridges and the faithful performance of the contract was guaranteed by a bonding company. The construction company failed to carry out the contract, and the bonding company having declined to assume the burden, the commissioners employed others to finish the work, and when it was done allowed and paid the bills deemed to be necessary and reasonable for the completion of the contract, but the construction company and the bonding company refused to reimburse the commissioners for the outlay. In this action against the construction and bonding companies the contract is interpreted, and although found to be somewhat ambiguous, is held to be valid; that upon the default of the construction company and the refusal of the bonding company to complete the work the commissioners were authorized to employ a builder to finish the work and to be entitled to recover for labor and any expenses reasonably necessary to complete the work in accordance with the contract, and that the plan adopted of paying such builder the cost of labor and material and a per cent for general expenses for things not easily enumerated, and which appear to be reasonably necessary, is permissible.

2. SAME. The construction company, which agreed to construct a bridge with a concrete floor, laid the concrete in the latter part of March in the presence and with the consent of an inspector employed by the county commissioners. The night following there was a sudden change of temperature, which resulted in freezing and disintegrating the concrete, so that the floor had to be relaid. No provision was made in the contract to relieve the contractor from the effects of frosts, storms or like casualty. *Held*, that the loss caused by the freezing of the concrete falls upon the contractor.

Appeal from Barton district court; DANIEL A. BANTA, judge. Opinion filed May 6, 1916. Modified.

*Glenn R. Donaldson,* and *Ewing C. Bland,* both of Kansas City, Mo., for the Western Casualty & Guaranty Insurance Company; *Clyde Allphin,* of Great Bend, of counsel.

*William Osmond, F. V. Russell,* and *R. C. Russell,* all of Great Bend, for the board of county commissioners.

The opinion of the court was delivered by

JOHNSTON, C. J.: The board of county commissioners of Barton county contracted with the Jenkins Construction Company, composed of E. N. Jenkins and George E. Sheldon, to build and repair seven bridges which had been destroyed or injured by the floods of 1912. The construction company furnished a bond for the faithful performance of the contract, signed by the Western Casualty & Guaranty Insurance Company as surety. The construction company failed to carry out its contract, and persons who furnished labor and materials to the construction company brought six separate suits against the construction company and its surety. As some money was still due to the construction company for work done upon the completed bridges, the board was made a defendant in each of the suits. For the purposes of the trial, all the cases were consolidated and tried as a single action without a jury. The court made findings of the amount due to each plaintiff, and gave judgment for the amounts against the construction company and the guaranty company.

It appears that three of the bridges, viz., the Drew, Vierthaler and Straub, were unfinished when the default occurred, and the principal dispute between the parties herein is in respect to the kind of abutments agreed to be built for the

Straub bridge. Under the agreement, seven of the bridges were to be built and spans of wrecked bridges were to be taken from the beds of streams, the whole to be done for $13,294. In a schedule attached to the contract, the price of each piece of work was stated, and the price named for the Straub bridge was $1200. It was stipulated that the bridges named should "have one roadway, 18 feet in clear width, and to be built with center line of roadway at right angles to abutments or piers, and to be constructed according to the annexed specifications and plans, which are made a part of this contract." The plans and specifications referred to were contained in a document designated as instructions to bidders and general specifications, and this was in the hands of the construction company when it submitted its bid and when the parties entered into the contract, and it was in the hands of the guaranty company when it executed its bond. In this document special reference was made to the Straub bridge as follows: "Bridge is a four panel sixty-nine foot span, built about 20 years ago. Abutment to be rebuilt of concrete and old bridge replaced. Bridge in fairly good shape, excepting part of the top chord which is badly twisted, county to furnish new lumber needed, either at Claflin or Gt. Bend." No detailed plans were made for the Straub bridge, nor indeed for any of the bridges. Two drawings or blue prints were made and used, and on the side of one of them there was an indorsement, "Design of bridge at Drew and Vierthaler crossings," and on the other, "Proposed bridge for Mud Creek." In each of these plans the abutments were represented to have wing walls. There was testimony to the effect that a separate drawing was not made for the Straub bridge, because it was a repair job, and also that the drawings made were intended to be guides for the work on all the bridges, including the Straub bridge. Testimony, too, was given to the effect that Sheldon, who was associated with Jenkins at the time, had gone over all the features of the work with the board, and was informed and understood that the abutments of the Straub bridge, as well as the others, were to be built with wing walls. There was a provision, too, in the instructions to bidders, that in case any question arose as to the meaning of the plans and specifications the interpretation of the board

should control, and bidders were requested to satisfy themselves as to the meaning of the plans and specifications, as they would be firmly held to the interpretation placed upon them by the board.

The guaranty company contends that the contract is entire, that the drawings or plans with reference to abutments had no application to the Straub bridge, and that the meaning of the term "rebuilt," used in the specifications, meant to replace the abutments in the form and dimensions of the old ones, and that, therefore, the requirement of wing walls was without justification. The contract in respect to the abutments was plain enough as to the material to be used, but was ambiguous as to the size and form of the same. The Straub bridge was to be built according to the plans and specifications annexed to the contract, and as the only plans made and considered by the parties provided for wing walls the court, we think, was warranted in holding that the bridge was to be rebuilt with wing walls.

The contract appears to have been an entirety, but as between the different parties contending here, it is deemed unimportant whether it is to be regarded as entire or severable. The whole work was to be done for $13,294, and completed at a stated time. It was stipulated that bids must cover the work as a whole, and none of the conditions of the contract indicate that the contractor could be relieved from the obligations of the agreement by anything short of full performance of the entire work. The schedule attached, stating prices for each piece of work, was probably intended as a basis for carrying out the provision that eighty-five per cent of the cost price should be paid to the contractor as each piece of work was fully completed. The contract, although ambiguous, was valid, and the ambiguity was cleared up to some extent by extrinsic circumstances, such as the acts and declarations of the parties. Where there is ambiguity in a written agreement parol evidence may be received, not to contradict the writing but to aid in its interpretation. To that end, the circumstances under which the contract was made and the practical construction put upon it by the parties themselves may be received. (*Baxter Springs v. Light Co.,* 64 Kan. 591, 68 Pac. 63; *Mayberry v. Beck,* 71 Kan. 609, 81 Pac. 191; *Parks v.*

*Baker*, 81 Kan. 351, 105 Pac. 439; *Riley v. Foster*, 95 Kan. 213, 148 Pac. 246.) In its decision, the trial court stated that as the case was before the court alone, some testimony was received relative to what transpired in connection with the letting of the contract, as an aid to an understanding of its provisions. However, the court stated that this testimony did not control its judgment nor lead to a variance or alteration of any part of the contract. After finding what was due to each of the claimants, the court found that there was due from the board to the construction company, for work that had been completed before the default, the sum of $3055.09, which it was required to pay into court for distribution among the claimants.

The court charged back against the board certain items expended by it in the completion of the contract. These findings are challenged on a cross-appeal which has been taken by the board. When the default occurred and the guaranty company declined to complete the contract the board employed the Missouri Valley Bridge & Iron Company to finish the work. It agreed to give that company the actual cost with ten per cent added for profit. In arriving at actual cost the customary method was adopted of taking the actual cost of material and labor and general expenses and upon the whole of these adding ten per cent for profit. A dispute has arisen as to what may be properly treated as general expenses. It seems to be a common practice to allow a certain per cent of the actual cost of material and labor to cover a great variety and number of things incidental to the work which can not well be enumerated and which are called general expenses. It is stated that fifteen per cent was allowed by the board for such expenses. No reason is seen why a reasonable allowance of this kind, based on builders' experience, may not be made, and some of the items disallowed were properly chargeable as general expenses. On the work done on the Straub bridge the court disallowed items amounting to $645.37, and on the Vierthaler bridge $213.48. Among these items are charges for tools, and the use of tools, expense of bond, insurance, repairs on machinery, freight, storage, blacksmithing, and for some materials such as gasoline, hardware and the like. There is testimony in the case that these things were necessary and reasonable in the

Kanzius v. Jenkins.

work and no proof to the contrary is found in the abstract. There are such items as railroad tickets, boots, stamps, postage and box rent, livery and telephone, which, although they were allowed and paid by the board, are deemed to be unreasonable and improper charges. The completion of the work having been thrown upon the board, it is entitled to charge and recover for any item of expense that was reasonably necessary to accomplish the task, but no more than that can be justified. In our view, the trial court should have allowed $603.07 of the items disallowed on the Straub bridge and $193.73 of the amount disallowed on the Vierthaler bridge. The sum of these two items, $796.80, with ten per cent of that sum added as profit as the contract provides, making a total of $876.48, should be added to the award made in favor of the board.

Another complaint is based upon the holding that the board was not entitled to recover $287, the cost of reflooring the Drew bridge. It appears that work was suspended upon the bridges by the construction company during the winter months, and about the middle of March it was resumed on the suggestion of the board, and the work was prosecuted from that time on with the approval of the inspector employed by the board. The concrete, which appears to have been of good material and properly mixed, was laid on the floor of the Drew bridge on March 27. At that time the temperature was moderate and suitable for such work, but during the night following the laying of the floor there was a sudden change of temperature, which resulted in freezing the concrete so that it disintegrated, and another floor was required to be laid, which was done by the board at an expense of $287. The only fault in the floor first laid was due to the change of temperature and the freezing which disintegrated the concrete. The provisions of the contract required the construction company to make a good, first-class floor, to the satisfaction of the board, and payment was not to be made until the work was completed and had been inspected and approved by the board. The question arises, Who must bear the loss resulting from the change of temperature? There is no claim that the construction company questioned the propriety of laying the floor so early in the season, and while it was done with the consent of the board and its inspector, there was no compulsion upon the company

to do it upon that particular day. The parties might have placed in the contract an exception which would have relieved the construction company from the effects of frosts, storms, floods or inevitable accidents, and every one familiar with the seasons must know that sudden changes of temperature are not uncommon here. The rule is that events against which parties may provide in advance in their contract can not be set up as an excuse for the nonperformance of the conditions of the contract. The courts can not insert exceptions that the parties might have done, nor relieve them from the hardships or casualties that they might have guarded against in the contract. (*School Trustees of Trenton v. Bennett*, 27 N. J. Law, 513; *West v. The Uncle Sam*, 29 Fed. Cas. 729, No. 17,427.)

In 30 A. & E. Encycl. of L. 1249, it is said:

"A contractor who agrees under an entire contract to construct an entire work is not excused from the full performance of his contract by the destruction of the work when partly completed, but must himself bear the loss, though such destruction is caused by unavoidable accident; and not only in such a case is he denied a recovery of compensation for the partly completed work, but the builder may recover from him partial payments made as the work progressed, and may maintain an action for damages against the contractor for failure to perform his contract. This rule has chiefly been announced where the structure was destroyed before completion by fire, but is equally applicable where the structure falls by reason of latent defects in the soil, or is destroyed by lightning, by a freshet, or by a storm."

If, under the contract, the board had been given the power to fix the time when the work should be done, and had required the construction company, against its judgment, to do it at an unseasonable time, the board would have been responsible for resulting injury, but no such control was vested in the board, and the mere fact that the inspector employed by the board was present and consented that the work should go on did not shift to the board the risk of a change of temperature or loss resulting from the freezing of the concrete. (*Ryan v. Bay City*, 160 Mich. 559, 125 N. W. 398.)

In *Meriwether v. Lowndes County*, 89 Ala. 362, 7 South. 198, a contract was made by a county with another to maintain a bridge and keep it in good repair for a period of five years. During this period the bridge was destroyed by an extraordi-

nary flood, but such a casualty was not excepted from the terms of the contract.   The court said:

"There is a long line of cases, both in England and this country, which settle the proposition, that an unconditional express covenant to repair, or keep in repair, is equivalent to a covenant to rebuild, 'and binds the covenantor to make good any injury which human power can remedy, even if caused by storm, flood, fire, inevitable accident, or the act of a stranger'; and that, while an act of God will excuse the nonperformance of a duty created by law, it will not excuse a duty created by contract." (p. 366.)

(*Clark v. Collier*, 100 Cal. 256, 34 Pac. 677; *School District No. 1 v. Dauchy*, 25 Conn. 530, 68 Am. Dec. 371; *Huyett & Smith Co. v. Edison Co.*, 167 Ill. 233, 47 N. E. 384, 59 Am. St. Rep. 272, and Note; *Milske v. Steiner Mantel Co.*, 103 Md. 235, 63 Atl. 471, 5 L. R. A., n. s., 1105, and Note, 115 Am. St. Rep. 354; *Mitchell v. Hancock Co.*, 91 Miss. 414, 45 South. 571, 15 L. R. A., n. s., 833, and Note; *Wm. A. Stover et al. v. James Allen et al.*, 48 Tenn. 486; 6 Cyc. 64; 6 R. C. L. 308, § 295.)

The consent of the board that the work should proceed at the time the floor was laid did not change the obligations of the contract nor make the board responsible for unforeseen losses that might have been provided against in the contract, but were not.   No act of the board brought to the attention of the court relieves the construction company from completing its work and turning over the bridge in good condition in accordance with the absolute requirements of the contract.   The board was therefore entitled to recover $287, the expense of relaying the floor.

The judgment will be modified, therefore, by adding to the award, made in favor of the board, the items for general expenses and the profit thereon, amounting to $876.48, and the $287 paid for the reflooring of the Drew bridge; and so modified, the judgment is affirmed.