No. 25,315.

Otto Swaller, *Appellee*, v. The Williamson Milling Company,
*Appellant.*

SYLLABUS BY THE COURT.

Contract—*Mill Manager—Bonus—Operating Expenses—Practical Construction—Excess Profit Under Government Control Not Earnings—No Account Stated—Account Stated Only Prima Facie Evidence of Correctness—Estoppel.* Besides a salary, a mill manager was to receive as bonus a percentage of earnings after regular operating expenses were paid and certain deductions were made, including a specified sum for depreciation and obsolescence. Power for the mill was purchased. *Held*:

1. The price of power was an operating expense, and whatever power cost, so long as the terms were fair the price was deductible from earnings in reaching a basis for computing bonus.

2. Repairs were operating expenses and were not chargeable to depreciation and obsolescence.

3. The terms of the contract were not ambiguous, and practical construction by the parties could not control the provision for deduction of operating expenses from earnings in computing bonus.

4. Excess profit derived from operation of the mill while under government control during the war, and paid to the government, was not a tax, but was a penalty for unfair practice, and was not earnings on which bonus was computable.

5. Validity of the bonus contract was not affected by adoption and enforcement of the government regulation limiting profit, lawful as a war measure.

6. Expenses of the company incurred in resisting an unjustifiable claim for excess profit made by the government were operating expenses.

7. Federal income taxes were operating expenses.

8. Items not involving expenditure within the fiscal year, such as depreciation in value of sacks and a tax suspense account, were not operating expenses for that year.

9. The evidence considered, and *held,* an account stated for bonus for a series of years was not established.

10. An account stated is only *prima facie* evidence that it is correct, and may be corrected for error, omission or mistake, to effectuate intention to balance accounts.

11. In the controversy over excess profit the government contended bonus should be charged to surplus. The mill company successfully contended the item should be charged to expense. *Held,* the company is not now estopped in the controversy with the manager to ask for correction of

the amount of bonus on account of discovered mistake in method of computation.

Appeal from Clay district court; FRED R. SMITH, judge. Opinion filed June 7, 1924. Reversed.

*William M. Beall,* of Clay Center, *Henry M. Beardsley* and *George D. Beardsley,* both of Kansas City, Mo., for appellant.

*W. T. Roche,* and *George L. Davis,* both of Clay Center, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a former manager of a mill to recover his contractual percentage of earnings in the last year of his employment. The milling company denied anything was due him and filed a counterclaim. Plaintiff recovered and defendant appeals.

The contract of employment was formed by acceptance of a proposition contained in a letter dated June 26, 1913, to plaintiff from F. L. Williamson, president of the company. The material portions of the letter follow:

"With further reference to the matter of handling the milling business at Clay Center of the Williamson Milling Company, wish to say that we would like to have you take charge of this business for us, and in line with the suggestion that you made, we offer you the following compensation: Salary $300 per month, payable monthly. Furthermore, we will offer you as a bonus a certain portion of the earnings above a fixed amount, and the basis I would suggest would be as follows: After all regular operating expenses are paid and the interest on the preferred stock is paid, together with interest on all borrowed money, there shall be set aside each year the sum of $4,800 to cover depreciation and obsolescence. After taking care of these items, I propose as follows: That on the excess earnings up to $8,000 per year, July 1 to June 30, you shall have a bonus of 5%; on any earnings above $8,000 and up to $18,000 you shall have a bonus of 10%; and on any earnings above $18,000 you shall have a bonus of 15%. As manager, you will be in full charge of the business, and will make, at regular intervals, reports to me and to A. L. Williamson, in a form to be agreed upon. We will provide necessary finances for handling wheat and to carry on the business, the finances to be looked after by Mr. A. L. Williamson, who will be treasurer of the company. The three of us who are the principal owners of the company are now furnishing a considerable portion of the working capital, and charging 6% per annum for the money, and will continue to furnish such a portion of the regular working capital as we can on that basis. Any extra funds that are needed for special occasions will be borrowed at as low a rate as can be secured. The milling property carries with it the elevator at Idana, Kan., but does not include power plant, as power is purchased. We want to arrange with you to handle this business on a basis that will be equitable, and believing that you will make

a great success of the business. We want you to take hold of it and push it as though it was your own property."

By virtue of his employment plaintiff managed the company's business from July 1, 1913, to July 1, 1920.

The cause was tried before a referee, who made findings of fact and conclusions of law, which were approved by the district court.

In April, 1918, A. L. Williamson died and F. L. Williamson, as president of the company, after consulting plaintiff, employed an accountant, T. B. Cornell, to audit and close the books of the company. In April, 1919, W. T. Dillon became auditor for the company. Subsequent to July, 1920, plaintiff asked Dillon for a statement of his account, and a statement was rendered showing him to be indebted to the company. Plaintiff then employed H. E. Ryker to audit the books of the company. The reports of these accountants were before the referee, and Dillon and Ryker were witnesses. The only other witnesses were the plaintiff and F. L. Williamson. The counterclaim challenged the method by which bonus was computed for the first five years of plaintiff's employment. For the sixth year heavy losses were sustained. The referee accepted the books for those years and returned the following findings of fact and conclusions of law:

"12. I further find that said plaintiff, as manager of said milling business, did not have control of the accounting department or the books of accounts of said milling business, and that the keeping of said books of accounts was under the immediate supervision or direction of A. L. Williamson, treasurer of said milling company, and Otto Bruggeman and other clerks employed by said milling company.

"13. I further find that the said Williamson Milling Company, defendant, computed and ascertained the bonus or percentage of the net profits of the earnings of said business for each and all of the years of plaintiff's employment as manager to the 1st day of July, 1919, crediting the same to his account, and paid the same out to plaintiff.

"14. I further find during the last year of said plaintiff's employment, beginning July 1, 1919, and ending June 30, 1920, that it is shown by the books of accounts of said defendant that the net earnings of said business were $12,141.56.

"15. I find that in determining said net profits for said year certain deductions were made by said milling company from its gross profits as and for operating expenses of said business, as follows, to wit: For power, the sum of $8,668.40; for depreciation, the sum of $5,782.18; for grain controversy, $9,164.77; for income tax, $2644.07; salary of F. L. Williamson, $3,000; for repairs, $5,389.35; loss on sacks, $1,260.00; for tax suspense, $818.56.

"16. I find that said charge for power exceeds the sum that said milling company should charge under said contract by the sum of $8,668.40; that the

deduction for depreciation is in excess of the sum permissible under said contract by the sum of $982.18; that the deduction of $9,164.77 in the grain controversy is not a proper deduction; that the sum $2,644.07 income taxes is not an operating expense, and should not be deducted.

"17. I further find that the salary of $3,000 paid to F. L. Williamson, as manager, should be deducted as and for operating expenses; that the sum of $5,389.35 expended for repairs should be deducted as an operating expense; also the sum of $7,200 interest on preferred stock, which is provided for in said contract between said parties.

"18. [In this finding the referee computes plaintiff's bonus for 1919-'20 from the preceding findings, and states it to be, with interest added, $3,438.09.]

"CONCLUSIONS OF LAW.

"1. I conclude from the evidence submitted in this case that the acts of the Williamson Milling Company, defendant, in computing and determining the bonus due plaintiff for each and all of the years of his employment, up to the 30th day of June, 1919, the payment to and the acceptance thereof by plaintiff of said bonus, in legal effect, was equivalent to an account stated between the parties.

"2. Therefore, as a matter of law, the said Williamson Milling Company, defendant, is not entitled to recover of the said plaintiff, as prayed in its said counterclaim.

"3. That pursuant to the terms and provisions of the contract between said parties and the proof submitted in this suit, the said plaintiff is entitled to recover of said Williamson Milling Company, defendant, a corporation, and have judgment for said sum of $3,438.09."

The contract of employment stated that power was purchased. The books showed what power for 1919-'20 in fact cost. The referee allowed eight cents per barrel of flour for cost of power. The amount shown by the books exceeded cost so computed by the sum of $8,668.40, which the referee disallowed. The disallowance originated with plaintiff's expert accountant, Ryker.

When plaintiff became manager of the mill it was operated by water power owned by persons who were stockholders of the milling company. In 1916 the river furnishing water power cut a new channel, and power was supplied by a steam plant at cost. The items were entered on the company's books and are not disputed. As prices of coal, labor and other factors entering into cost advanced, the charges advanced. Ryker found in the minutes of the board of directors of the company an entry dated June 30, 1913, authorizing the president to sign a ten-year contract for power at eight cents per barrel of flour. There was no evidence such a contract ever was signed, or agreed to orally, but Ryker conceived the notion plaintiff had a vested interest in the eight-cent rate as long as he was manager, and no matter what power might cost the com-

pany, only eight cents per barrel could be deducted from earnings when computing bonus, unless plaintiff consented. Ryker testified as follows:

"I knew the arrangement between the milling company and the parties supplying the power could be changed at any time, but not so as to affect Mr. Swaller's commission, without being approved by him. It is on this basis that I disallowed the $8,668.40 in the accounting."

Ryker was mistaken. The price of power for the mill was to be on the basis of approximate cost of production. At first the eight-cent rate applied; but when cost of producing power went up to ten cents, and finally to eighteen cents per barrel, the producers could not furnish it at eight cents, and the actual cost items were charged to the milling company. According to plaintiff's contract, power was an operating expense, and whatever power cost, so long as the terms were fair, the price was deductible from earnings in reaching a basis for computing bonus.

Because in computing bonus for the first few years cost of power was entered on the books at eight cents per barrel, plaintiff contends the parties were bound by a practical construction of the contract. The doctrine of practical construction is also invoked in respect to the manner of accounting for repairs. The doctrine has no application to either subject.

In the case of *Manufacturing Co. v. Cruzan,* 63 Kan. 411, 65 Pac. 647, it was said that acts of parties tending to show a construction put upon a contract by themselves may be considered when the meaning of the contract is doubtful. In *Baxter Springs v. Light Co.,* 64 Kan. 591, 68 Pac. 63, it was said that when a contract is ambiguous in its terms a construction given to it by the parties is competent to explain their understanding of it. In the case of *Mayberry v. Beck,* 71 Kan. 609, 81 Pac. 191, a deed was ambiguous. Parol evidence was admitted to show the situation and condition of the property conveyed, the circumstances under which conveyance was made, and the practical construction put upon it by the parties. In *Brick Co. v. Bailey,* 76 Kan. 42, 90 Pac. 803, the contract was ambiguous. The court said it was not called on to solve the ambiguity, as the parties had interpreted the instrument and had acted on the interpretation. The syllabus reads:

"Where certain terms of a contract are ambiguous, but such terms have been construed and acted upon by the parties interested, such construction will be adopted, even though the language used may more strongly suggest another construction." (¶ 3.)

In the case of *Water Co. v. City of Beloit,* 91 Kan. 665, 139 Pac. 388, a contract was susceptible of interpretation as the parties had interpreted it. The court said that if the meaning were doubtful the interpretation of the parties in correspondence and by conduct should be adopted. In the case of *Kanzius v. Jenkins,* 98 Kan. 94, 157 Pac. 417, a contract, though ambiguous, was valid, and the ambiguity was somewhat cleared up by acts and declarations of the parties. In the case of *Carlisle v. Business Association,* 104 Kan. 512, 180 Pac. 280, a contract was ambiguous. The court reached a conclusion respecting its meaning, from the contract, from the answer, from the evidence, and from the interpretation given it by the parties. In *News Service v. Printing Co.,* 103 Kan. 402, 173 Pac. 980, it was held the language of a contract and the interpretation placed upon it by the parties justified the conclusion reached by the trial court. In *Merkle v. Hiatt,* 103 Kan. 767, 176 Pac. 655, it was held the interpretation placed on a contract by the parties for ten years and the positive and reliable evidence of witnesses justified a judgment reforming the contract. These cases illustrate the use which may be made of practical construction in ascertaining the meaning of a contract. In no case was practical construction allowed to give cast to the meaning of an unambiguous instrument.

In the case of *Brick & Tile Co. v. Fidelity & Guaranty Co.,* 108 Kan. 21, 194 Pac. 316, the contract was not ambiguous, and an operative interpretation was invoked. The court said:

"In order that practical interpretation may be of value in determining the meaning of an instrument, the instrument must be ambiguous. . . . The subject of practical interpretation of contracts is treated at length in 13 Corpus Juris at page 546 and following pages." (p. 25.)

The text referred to reads as follows:

"But practical construction is not conclusive, and may be considered only when the contract, read in the light of the surrounding circumstances, leaves the proper construction in doubt. The practical construction put on a contract by the parties cannot control the express unambiguous provisions of the instrument itself. . . ." (p. 548.)

The reason for the rule is obvious. In case of uncertainty, operative interpretation may be resorted to, to assist in arriving at meaning—not to contradict the writing. If there be no ambiguity, admission of evidence of operative interpretation in opposition to express terms would violate the parol-evidence rule.

In this instance plaintiff sued on the contract. Its terms are free from any ambiguity whatever in respect to purchase of power and

allowance for operating expenses and depreciation and obsolescence. The mill could not be operated without power. Power was purchased as a regular operating expense, and Ryker's notion that the price had to remain constant for the purpose of computing bonus through a series of years was fatuous. Even Ryker admitted repairs are operating expenses and are not classifiable with depreciation and obsolescence.

Plaintiff caused the book entry of price of power to be changed from eight cents to ten cents per barrel. He said this was done for the purpose of computing income tax, but was not to affect his bonus. When the change was made is not disclosed. The first income tax law was passed in 1913, and income taxes were payable in 1914. The subject, however, is of no consequence, because, as plaintiff states the circumstances of the change, it affected neither price actually paid for power nor his bonus contract.

The referee properly reduced the amount of deduction from earnings on account of depreciation and obsolescence for the year 1919-'20 by the sum of $982.18, because the total deduction permissible under the contract was $4,800.

The item designated "grain controversy" in the 15th and 16th findings, which the referee declined to deduct from earnings, arose in this way: The food administration controlled foods during the war by prescribing the conditions under which dealers might operate. The control was extended to flour mills. The problem was a complicated one and the methods of dealing with it were modified from time to time as experience suggested. The basis of regulation during the time material to this controversy was the cost-plus system, and profit was limited to 25 cents per barrel of flour. The subject is covered briefly by the testimony of the president of the company, and is illuminated by the following extract from the War Trade Board's volume, "Government Control Over Prices" (1920):

"Considerable difficulty was experienced in determining costs. To have accomplished this task completely would have required an army of auditors at work constantly on the montly reports which millers were compelled to submit. But since the cost-plus method was to be followed in determining the selling price some uniform method of figuring costs must be adopted, and before November, 1917, the following rule had been presented to the mills:

"In calculating profits the cost of flour, bulk, at the mill shall be determined as the cost of clean wheat used multiplied by the actual cost of wheat used (which in no event shall be in excess of 285 pounds of cleaned, 60 pounds per bushel, wheat to the barrel), less the amount secured from the sale of feed (excluding the profit derived from the sale of feed, not to exceed 50 cents per

ton as above), plus the actual proven cost of production (which shall not include interest on investment and marketing).

"In the fall of 1917, after the price of wheat under government control became stabilized at a point much lower than had prevailed in the spring and summer markets, the rush of milling was so great that many mills did not or could not reduce the price of flour fast enough to keep profits within the margin of 25 cents a barrel. At the end of the crop year (June 30, 1918), and in some cases earlier than that date, those mills which had made profits above the maximun of 25 cents a barrel were compelled to return the surplus to the government.

"At the present time (May 15, 1919) the food administration still has auditors in the field to check up expense items of mills. Although a few mills have retained their excess profits for two years, they will now be compelled to part with them." (pp. 69, 70.) ..

At different times three sets of government auditors descended upon the company's books, and after investigation an informal demand was made on the company for payment to the government of $50,000 excess profit. Later formal demand was made for $28,000. There were hearings at Kansas City, Mo., and Washington, D. C. After the hearings at Washington the company was obliged to pay to the government $15,932.94 to prevent revocation of license to operate its mill. The payment was made, however, under agreement there should be a recheck by an accountant agreed on by the government and the company. When the recheck was made the government refunded to the company $10,192.12. At the beginning of the controversy the company had paid an agreed item of $452.08. The expenses of the company in defending itself against the first outrageous demands and in procuring final adjustment were $2,921.07. The gross outlay on account of "grain controversy" was $9,164.77.

Ryker said the excess profit paid to the government was not an operating expense, which is true. He said, however, the item should have been carried to surplus, and when paid should have been deducted from capital. So treated, plaintiff was entitled to a bonus on the item. The difficulty with this theory is, the item was not an earning at all, and plaintiff's bonus was computable on earnings. The company, and plaintiff as its manager, were forbidden to produce the fund. While the money did come in and was accounted for on the books, it was not an asset of the company. The company was prohibited from keeping it, and when it was paid over to the government the situation was precisely the same, so far as earnings for benefit of either company or manager were con-

Swaller v. Milling Co.

cerned, as though it had not been received in connection with operation of the mill. Ryker speaks of the item as a surplus-profit tax. If it were a tax it would be an operating expense, but it was not a tax. In order to curb vicious speculation, stabilize prices and induce conservation of resources, the government defined reasonable profit and undertook to prohibit unreasonable profit. As a penalty for unfair practices the government simply appropriated to itself, at the source, all profit above 25 cents per barrel.

Plaintiff suggests that validity of his contract, made before the war, could not be affected by subsequent government regulation. Validity of his contract was not affected. He was still entitled to his bonus on legitimate profit from operation of the mill, and it scarcely seems necessary to debate authority of the federal government to adopt and enforce an emergency regulation limiting profit for better security of the nation in the extremity of war.

The company claims its outlay for expense in the grain controversy was operating expense. The term "operating expense" is one of indefinite but comprehensive meaning, whose application in a particular case depends on circumstances. In the case of a company which maintains mills and elevators, buys wheat, manufactures the wheat into flour, and markets the produce, to produce earnings, it means vastly more than mere expense of causing the mill machinery to function. The grain-controversy expenditures were made in 1919. The Cornell audit was made in 1918. Ryker and Dillon both accepted Cornell's deductions for expenses, which included, among others, the following items: Salaries, commissions, traveling, attorney fees, donations, bonus, advertising, postage, telephone and telegraph, stationery and printing, insurance, taxes, inspection fees, food administration fees. There is no doubt that such items were regular operating expenses, and the expenses incurred in the controversy with the government were such expenses.

Ryker said he disallowed the company's expenses in the grain controversy because they were incurred in keeping profits already made. If that were true, expense of any litigation growing out of operation, commenced after the books for the fiscal year were closed, could not be charged to expense of operation. Controversies incident to operation of any large business are of such common occurrence that neither company nor manager can fail to take them

into consideration, and the expenses incurred are always regarded, so far as the court is advised, as operating expenses. In this instance the government's claim arose out of operation of the mill under plaintiff's management. In view of the final result, the original demands upon the company were made recklessly. After the controversy reached Washington the company was obliged to make payment of an exhorbitant sum of money in order to retain the privilege to keep the mill running; and under the circumstances the court deems it quite absurd that the expenditures should be taken out of capital and not out of earnings.

In revising the deductions from earnings Ryker allowed all taxes except the federal income-tax item of $2,644.70. The referee and the district court took Ryker's view. This court recently held that income taxes are operating expenses for the purpose of determining reasonableness of a public-utility rate. (*The State, ex rel., v. Telephone Co.,* 115 Kan. 236, 223 Pac. 771.) The court perceives no sound distinction between this charge on earnings and other taxes, as expenses of operation, and the deduction should have been allowed.

Plaintiff complains of deduction from earnings of the president's salary. The evidence showed that after the death of A. L. Williamson, F. L. Williamson, as president, performed services for the company and drew a salary of $250 a month. The contention is that he could not draw salary without a contract (*Trust Co. v. Robinson,* 89 Kan. 842, 132 Pac. 979), and that the evidence failed to establish a contract. The cross appeal, therefore, is based upon the fact the finding and judgment are contrary to the evidence. The subject may not be considered. Although plaintiff filed a motion to modify the finding, he filed no motion for a new trial. (*The State, ex rel., v. Telephone Co.,* 115 Kan. 236, and cases cited, pp. 266, 267; 223 Pac. 771.)

Defendant complains because the items loss of sacks and tax suspense were not deducted from earnings. These items were not expenditures within the fiscal year, and construing the term "regular operating expense" as meaning disbursements, the deductions were properly disallowed.

The counterclaim challenged the allowance for bonus for the first five years because repairs were not deducted from earnings as an item distinct from depreciation and obsolescence. The computation is not disputed, and if the subject is open for considera-

tion the company should recover the amount plaintiff was overpaid. The district court approved the referee's conclusion that consideration of the subject was foreclosed because of an account stated.

The referee does not base what he called his first conclusion of law on the findings of fact. It is a conclusion from the evidence at large. The twelfth and thirteenth findings represent the referee's views respecting some of the facts, but not all the facts material to the issue, and the company's request for more specific findings, duly presented and properly urged, was well founded. Plaintiff is contending here that the finding of account stated was based on conflicting evidence. If so, the company was entitled to know what facts the referee regarded as established, on which his conclusion of law was predicated. It will not be necessary, however, to remand the cause for a new trial, since the pertinent evidence is brief and this court can determine the matter from undisputed facts and evidence favorable to plaintiff.

The twelfth finding of fact is not supported by the evidence. Plaintiff's contract placed him "in full charge of the business," which gave him control of the accounting department as an indispensable instrument of management. The company's sales amounted to as much as $1,125,000 in a year, and it would be queer management that had nothing to do with the accounting department. Plaintiff did initiate control in one instance at least. In a conversation with the president, who was one of the power owners, plaintiff arranged for manipulation of the power account so it would reduce income taxes but would not affect his bonus. Plaintiff testified he talked with the bookkeeper from time to time about the method of taking care of the business, and his own statement of the relation of A. L. Williamson to the mill follows:

"Mr. A. L. Williamson was down at the mill every day. He looked after the outside affairs, but was in the office every day he was in town. I was in control of the business as general manager, subject more or less to A. L. Williamson's advising capacity."

The evidence of the only other witness on the subject was that A. L. Williamson's work was in connection with outside affairs, that he did not go into the office or have anything to do with bookkeeping, and that bookkeeping was under plaintiff's direction as manager. A. L. Williamson died in April, 1918, and plaintiff's employment continued to July, 1920. Plaintiff testified he advised with Cornell while Cornell was working on the books, and plaintiff

participated in the grain controversy, which involved the company's whole system of accounting. Of course plaintiff had nothing to do with the books themselves. He was mill manager, not bookkeeper, and, as he said, he never made an entry in the books. Bruggeman was bookkeeper, except while in the army, when Miss Brown took his place, and detail work was done by McKee and a stenographer. The result is, the finding that the manager of the business had no control over the accounting department does not state the true situation, and the finding that keeping the books of account was under immediate supervision of A. L. Williamson is without any support in the evidence.

The portion of the thirteenth finding which states that the Williamson Milling Company computed and ascertained plaintiff's bonus during all the years of his employment conveys no information of importance. That would be true if the plaintiff himself supervised the computation.

The finding that plaintiff's bonus was credited to his account is an uncontroverted fact. The following are the credits:

| | |
|---|---:|
| June 30, 1915 | $2,151.66 |
| December 30, 1916 | 372.05 |
| July 20, 1917 | 374.99 |
| December 31, 1917 | 1,187.31 |
| June 29, 1918 | 3,892.59 |

It is not disputed, however, that this account was a running account, consisting of a multiplicity of diversified items, continuous on both sides, and never at any time balanced during the entire period of plaintiff's employment. The total credit side of the account amounted to $61,582.84, and between April 15, 1920, and July 1, 1920, when plaintiff severed connection with the mill, he drew out $15,783.92, all cash except less than five dollars.

The finding that plaintiff's bonus was paid out to him and accepted by him is true in a sense, but does not disclose what actually occurred. Plaintiff was simply charged on the account described for coal, oil, tires, batteries, flour, etc., and with checks initialed by the bookkeepers or by McKee, or signed by himself.

Plaintiff testified that while A. L. Williamson lived, Williamson and the bookkeeper made adjustments, including adjustment of bonus, which were submitted to plaintiff. There was, however, no more evidence that A. L. Williamson could bind the company by collaboration with the bookkeeper than that the bookkeeper un-

assisted could bind the company. The amount of bonus for 1917-'18 was taken from Cornell's report. Concerning Cornell's employment plaintiff testified as follows:

"Mr. Williamson asked me if it would be agreeable to me for him to have an auditor go out there and go over the books. I told him I would like to have the books checked over thoroughly, and that was done. The milling company paid for it."

As indicated, plaintiff advised with Cornell while Cornell was working on the books. Cornell's report was made for the common benefit of everybody interested in the business, but bound nobody (*Stagg v. Fair Association*, 105 Kan. 600, 185 Pac. 893), and disclosed on its face that bonus for that year was not correctly ascertained. Plaintiff testified he heard no complaint about it and he never discussed the subject of bonus with F. L. Williamson. F. L. Williamson does not reside in Clay Center. He testified that from 1915 to 1918 he received from the mill reports covering various items, such as sales, the booking, wheat and flour on hand, financial statements, balance sheets, etc.

There is no other evidence favorable to plaintiff bearing on the facts constituting the burden of the first conclusion of law—computing and determining bonus, and payment and acceptance of bonus. The result is, the referee did not and could not find account stated involving a general balance, because there was no statement of an agreed balance of account at any time during plaintiff's employment. All the referee could say was that one yearly item of an open account was the equivalent of an account stated.

It was important to manager and company to know at the end of each year how many barrels of flour had been made and sold, what they cost, and what they sold for. Operating profits or operating losses, the balance between earnings and expenses, was a subject of primary importance, considered entirely by itself. There is no evidence from which the inference may be derived that operating profits were ascertained each year for the peculiar purpose of asserting them against plaintiff as the basis of computing his bonus. They were ascertained just as the operating profits of any well-conducted business are ascertained, and the necessary computations were simply part of the day's work of the accounting department at the end of each fiscal year. Bonus was then a mere matter of clerical calculation—deduction from profits of interest and depreciation, and application of the bonus percent-

ages. The accounting sheets were passed to the manager as a matter of course, and plaintiff nowhere indicates in his testimony that he felt or expressed approval or disapproval, or even examined them. The bookkeeper completed his work by crediting bonus to plaintiff's account, except in one instance when plaintiff asked for an advancement on bonus, and plaintiff drew money from his account as he needed or desired. The result is, account stated was not established as a defense to the counterclaim. (*Clark v. Marbourg,* 33 Kan. 471, 6 Pac. 548.) For purposes of the decision, however, the court will accept the referee's finding of account stated.

In the case of *Schmoker v. Miller,* 89 Kan. 594, 132 Pac. 158, the syllabus reads:

"Where in settlement of extensive business transactions parties have deliberately accounted and in good faith agreed upon a balance intended to be final, the result should be accepted by a court unless for some legally sufficient reason substantial justice requires that the settlement should be opened or set aside." (¶ 3.)

What are legally sufficient reasons for not permitting an account stated to be final and conclusive? Fraud, of course; but there are other reasons. Error, omission and mistake are also sufficient.

In its origin, account stated was a fact. Parties met, canvassed the items of their transactions, struck a balance, concurred in it, and then, putting the items behind them, agreed to stand on the balance. The adjustment and the agreement acually occurred, and the agreement became a new contract, mutually binding. With the advent of modern business methods the conception lost reality. The parties did not meet and canvass items; mutual concurrence in balance became an implication, and agreement to pay the balance became a legal fiction. The consequences are revealed in the portion of the article on accounts and accounting devoted to account stated in 1 C. J., beginning on page 678.

Since a creditor who sent to a debtor, who did not respond, a footed but incorrect amount, meaning no more than "I have you charged with these items totaling so much," ran great risk of having a jury find an account stated "from the circumstances," the practice arose of adding to accounts rendered the words "errors and omissions excepted." In this state the law writes those words into an account rendered, together with an exception of mistake, which may be of law or of fact, and on one side only. The result is, so far as correctness is concerned, an account stated is *prima facie* evi-

Swaller v. Milling Co.

dence only. (*McCue v. Hope*, 97 Kan. 85, 154 Pac. 216.) While the agreement implicit in account stated stands, and the account may not be opened except for some cause impeaching it as an entirety, the correction of error, omission or mistake merely effectuates the intention of the parties to balance their accounts.

Since account stated does not prevent assertion of the counterclaim, the statute of limitations does not apply to it. (R. S. 60-715.)

Plaintiff argues that amount of bonus for the year 1917-'18 should not be corrected because it was contended for and allowed in the grain controversy. Plaintiff testified as follows:

"We debated in the discussion with the food administration over the item of my bonus. The government wanted to charge it to surplus, and we had it charged as expense, and we got credit for it as an expense item. As I understood it, that was a matter debated at our hearing in 1919."

There is no evidence that amount of bonus was involved in the grain controversy. The question was, to what account should the item of bonus be charged. Plaintiff is not in privity with the government, and the estoppel must reside, if anywhere, in the company's taking inconsistent attitudes, with knowledge of the facts. By asserting now, against plaintiff, a discovered mistake in amount, the company contradicts nothing it asserted against the government when contending bonus was something to be charged to expense and not to surplus.

The company should be permitted to amend its answer to conform to the proof. Proper allowances for bonus should be computed in accordance with the views which have been expressed. The excess-profit item should be deducted from earnings of the year in which it accrued, and expenses of the grain controversy should be allowed as operating expenses of the year in which they were paid. The court will state the account, and render judgment for the balance in favor of defendant.

The judgment of the district court is reversed, and the cause is remanded with direction to proceed as indicated.

HARVEY, J., dissenting.