## Paper Mill Supply Co., Appellant, v. Container Corporation of America.

Argued May 14, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Alvin L. Levi,* of *Levi & Mandel,* for appellant.—When a corporation intrusts a manager with the general supervision of a particular branch of its business, it invests him with the power of a general agent coextensive with the business intrusted to his care: American C. & F. Co. v. Water Co., 218 Pa. 542; Buckwalter Stove Co. v. Central T. & S. Co., 53 Pa. Superior Ct. 558; Singer Mfg. Co. v. Christian, 211 Pa. 534; Humbert v. Meyers, 279 Pa. 171; Sun Printing Co. v. Moore, 183 U. S. 642.

The record of testimony clearly shows that the general manager had final authority to make contracts and fix prices for the purchase of waste products and to make contracts and fix rates for hauling.

Declarations of an agent as to the scope of his authority are admissible in evidence when followed up by independent proof of such agency: Singer Mfg. Co. v. Christian, 211 Pa. 534.

*Clarence L. Mitchell,* of *Kirchner, Mitchell & White,* for appellee.—The declarations of an agent are not proof of his authority: Mahoning Valley Bread Co. v. R. R., 83 Pa. Superior Ct. 379.

The question in the instant case is governed by the principles announced in the recent case of Long v. Lehigh Coal & Navigation Co., 292 Pa. 164.

OPINION BY MR. JUSTICE SCHAFFER, June 21, 1930:

Plaintiff appeals from the refusal of the court below to take off a nonsuit in an action to recover damages for the breach of an alleged oral contract made with the manager of defendant's Philadelphia plant.

From a reading of the testimony alone, without the guiding language of appellant's carefully-prepared statement of claim, it would be somewhat difficult to say just what the assumed contract is "because of the more or less obscure and haphazard way in which the testimony was given," as the very able trial judge observed in entering the nonsuit. Our careful reading of the evidence leaves its terms in much doubt. Supplementing the testimony with the averments of the statement of claim, the situation would seem to be this: Defendant was a manufacturer of articles in the making of which large quantities of waste paper were used. Plaintiff was a trucker and dealer in waste paper. It is alleged that Carey, defendant's manager of its Manayunk mill, agreed with plaintiff that the latter was to sell and deliver to defendant such quantities of waste paper stock as it was able to obtain, plaintiff to confine its purchases from third parties to the City of Philadelphia and the territory surrounding it within a radius of approximately 100 miles, defendant to pay to plaintiff for the paper delivered to it in its Manayunk mill upon the trucks of plaintiff a price to be temporarily determined at a rate to be fixed by Carey. It was further agreed that plaintiff, after delivering the waste paper stock to the defendant at its mill, should there receive from defendant such quantity of manufactured products made by it as the trucks of plaintiff had capacity to transport to such places as defendant might require, defendant to pay to plaintiff for such hauling a temporary price to be determined at a rate also to be fixed by Carey. The contract was to remain in force during such time as plaintiff continued to sell and deliver material to defendant and to transport its commodities, with the understanding that it might be terminated by either party upon notice to be given before the first of January in any year. It was further set up as one of the terms of the agreement that in the event that plaintiff should suffer loss in its business as a result of its performance, defendant

would pay the full amount of such loss to plaintiff at the termination of the entire contract. It was shown that during the continuance of the business relations between plaintiff and defendant, the temporary rates fixed as the prices for the hauling were raised, and that at times statements were rendered by plaintiff to Carey showing the result of its operations. Plaintiff alleged that in performing the contract it had suffered losses in its business amounting to $44,555.14 during the time the alleged contract was in force, from October, 1926, to January 1, 1929. These losses were claimed not only on the business done for defendant, but on its business generally.

The alleged contract, therefore, comes down to this, that the defendant had agreed to an arrangement, indefinite as to time, but terminable upon notice before the first of January of any year, to buy all the paper stock which could be supplied to it by the plaintiff, obtained by the latter in the territory named, and that the plaintiff was to do hauling to the capacity of its trucks for the defendant, both the waste paper stock supplied and the hauling to be paid for at temporary rates, and if these temporary rates did not cover the cost of carrying out the contract to which plaintiff would be subjected, defendant, at the termination thereof, was to pay to plaintiff whatever losses it might sustain in its business generally.

This is certainly a somewhat remarkable and out-of-the-ordinary business arrangement and before defendant could be held obligated to such an undertaking, it would have to appear very clearly that the manager of its mill had authority to enter into such a contract; the existence of such authority was denied in the affidavit of defense. Defendant had a number of plants in different parts of the country. Its business headquarters were in Chicago. All that was shown with any degree of certainty was that Carey had authority to enter into contracts for the purchase of supplies and for hauling at the

one plant. The testimony indicates that these contracts involved paying the market price for waste paper stock at the time of its delivery, which prices fluctuated from time to time, and paying the hauling charges at fluctuating prices. It nowhere appears that he had authority to bind his company for an indefinite time in either respect and it is not shown at all that his authority extended to the making of a contract guaranteeing the plaintiff against loss in its business. It could not be assumed that the manager of a mill, whatever his contractual powers were in respect to the mill's operation, had the authority to obligate his company for any such liability as might be entailed by the contract here set up, which as the trial judge said was virtually the writing of a blank check by defendant to plaintiff. Defendant had no control over the salaries to be paid to the officers of plaintiff or any other expenditures which it might make contributing to losses in its business. It could have done hauling for other persons at ridiculously low rates and the defendant would have had to make up the loss, and it could have bought waste paper at prices extravagantly high and the defendant would have had to likewise respond.

Plaintiff argues that this is in effect analogous to a "cost plus" contract, but it is nothing of the kind. In a "cost plus" contract the performing party's profit is limited to the amount specified and the paying party would get the advantage of any excess profit earned. In a "cost" contract the latter would get the advantage of all profit. In the pending case, if defendant had conducted its business more economically and the cost of performing the contract had been much less than the amount paid by defendant, thereby giving plaintiff a profit, defendant would not be entitled to any part of it. It is difficult to imagine a more jughandled contract than this would be, every advantage is on one side, defendant had all to lose and nothing to gain; if there was a loss, it must respond for the deficiency; if a gain, plaintiff

kept it. There is no limit to the defendant's obligation. It was fixed at whatever plaintiff's loss might be. Previous to the alleged contract, the defendant was not bound to purchase paper stock, if it did not need it, nor was it bound to have hauling done, if it had nothing to haul. Under the alleged contract, it was compelled to purchase all the paper stock which plaintiff might buy within a radius of 100 miles from Philadelphia and to furnish for hauling such quantities of finished products as the plaintiff's trucks had capacity to haul.

It is admitted by appellant that the testimony produced by it did not go to the extent of showing that Carey had made contracts similar in their important aspects to the one in suit. It may be stated as a cardinal principle of business dealings that the making of no such contract as this could be assumed to be within the powers of the manager of a mill, and before acting upon assumed power by such an official, it was the duty of the other party to the contemplated contract to trace his authority to its source to ascertain whether he possessed such power. "The party who seeks to charge a principal for the contracts made by his agent must prove that agent's authority": Long v. Lehigh Coal & Navigation Co., 292 Pa. 164, 170. As was said in that case, quoting from a previous decision (page 173): "This was not an every-day business transaction, but a contract of a special character that would naturally call for the exercise of the judgment of the board of directors or at least of evidence from them of authority in [Carey] generally to make such an obligation," and further quoting from that case, "When one deals with an agent he is bound to ascertain the nature and extent of the agent's authority. He may not trust to a mere presumption of authority, or to any mere assumption of authority by the agent; but must trace the authority to its source if he would be protected." The court below properly determined that no authority to enter into such a contract was shown to exist in the manager. We are also of

opinion that the alleged contract was so indefinite and uncertain in scope and as to liability imposed as not to be enforceable under the principle laid down in Machen v. Budd Wheel Co., 294 Pa. 69, and the cases therein cited.

The judgment of nonsuit entered by the court below is affirmed.