## Currie *v.* Land Title Bank & Trust Company, Appellant.

Argued January 5, 1939. Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Warwick Potter Scott*, with him *Knox Henderson*, and *Frederic L. Ballard*, of *Ballard, Spahr, Andrews & Ingersoll*, for appellant.

*Samuel Scoville, Jr.*, for appellee.

Opinion by Mr. Justice Stern, March 22, 1939:

This case turns upon a letter written to plaintiff by his broker and friend Morris L. Parrish under date of March 13, 1930. Was it clear and unambiguous? Or was it of such dubious meaning that it required oral evidence as the guide, and a jury as the tribunal, for its interpretation?

Plaintiff carried a collateral loan account with defendant company. During the winter of 1929-30 he was in Europe. On January 8, 1930, Parrish cabled him at Paris: "Miss Yackey needs fifteen thousand her account Pennsylvania Company. Do you feel like helping her?" No answer being received, on January 14 Parrish cabled to him again at London: "May we have deposited fifteen thousand for Miss Yackey at Pennsylvania Company? Answer quickly." The Miss Yackey referred to in these messages had been employed in an editorial capacity on the Ladies Home Journal, of which plaintiff had been editor-in-chief. Parrish had acted as her broker on two or three occasions, having been originally recommended to her in that capacity by plaintiff. Miss Yackey had a collateral loan account at the Pennsylvania Company.

On February 13 plaintiff wrote to Parrish from Rome, explaining that the latter's cable had been delayed almost a week in transit and he had assumed "it was then too late to do anything." He added, however, that "had I been home I could have taken care of it, and would gladly have done so," and that he had heard from a friend of Miss Yackey that "she had been taken care of and that everything was working out all right. This was good to

hear. It was fine of you to have come to her rescue as you did."

Due to a rise in the market, or for some other reason, the Pennsylvania Company withdrew its demand upon Miss Yackey for additional margin at that time, but in March gave notice that it required further collateral from her to the extent of $6,000. Parrish thereupon assumed the responsibility of requesting defendant to transfer from plaintiff's account fifty shares of American Can Company common stock, then worth about $7,000, to Miss Yackey's account at the Pennsylvania Company, and defendant acceded to this request upon receiving from Parrish his written guaranty against any loss it might sustain by reason thereof. Parrish then wrote to plaintiff, at Naples, the letter of March 13 which is the subject of the present controversy, and the relevant portions of which are as follows: "The Pennsylvania Company at first decided that they would carry Miss Yackey's account, at any rate until your return. They have now taken over the Colonial Trust Company, and in order to get their house in order before the combination takes place, they have asked her for $6,000 additional collateral. Geiger [a vice president of defendant company] has stated that he would deposit 50 shares of American Can stock of yours with them on my guarantee. This I have given him, so the matter can rest until your return. . . . I hope you will approve of what I did for Miss Yackey. I will take care of it if you do not."

On April 11 plaintiff wrote to Parrish from Paris: "That was all right about that American Can for Miss Yackey, but isn't the market high enough for her to lighten down a bit? Do you notice where Indian Territory and Vanadium is?"

Notwithstanding the aid thus given to Miss Yackey's account, the Pennsylvania Company was obliged to sell out her collateral in 1936, including the American Can

stock, and leaving a debit balance due the Pennsylvania Company.

The present suit was brought in trespass for conversion of plaintiff's stock. The defense was that although Parrish did not originally have authority to request defendant to transfer the stock to Miss Yackey's account, plaintiff ratified the transaction in his letter of April 11. Plaintiff, on the other hand, while apparently admitting, as he must, that this letter was, on the face of it, a ratification, contends that he was not bound by it for two reasons—the one, because he did not know at that time how weak Miss Yackey's account was, and the other, because he interpreted the Parrish letter of March 13 to mean that Parrish had given to defendant his guaranty to protect, not defendant, but *him*, plaintiff, against loss. The learned trial judge left to the jury the question of determining what the letters between the parties "fairly mean, giving to the language of the letters the ordinary and customary meaning of the words as used." The court also affirmed a point presented by plaintiff to the effect that if the Parrish letter "could reasonably be understood by plaintiff to mean that plaintiff was guaranteed by Parrish against any loss in connection with the delivery of his said shares of stock of the American Can Company and that it was so understood by plaintiff, then the jury may find that the letter by plaintiff to Morris L. Parrish, dated April 11, 1930, was not a ratification of the defendant's act in delivering plaintiff's stock, without plaintiff's knowledge or consent, to another party, and that plaintiff had no true or full knowledge of the facts of the transaction when he wrote such letter, which is offered as a ratification in behalf of the defendant." The jury found for plaintiff and the court overruled defendant's motion for judgment n. o. v.

Plaintiff neither does nor can contend that the Parrish letter contained any misstatements or deliberately concealed any facts. He complains, rather, as he himself expressed it in his testimony, that "I never dreamed the

account [Miss Yackey's account] was in such shape that it was, or it was as large a loan." It is undoubtedly a general principle of law that a person affirming a transaction, made on his behalf but without his authority, may avoid the effect of his ratification if at the time he was ignorant of material facts: *Daley v. Iselin*, 218 Pa. 515, 518; *Shields v. Hitchman*, 251 Pa. 455, 459, 460; *Culbertson v. Cook*, 308 Pa. 557, 564, 565; *Simonin's Sons, Inc., v. American Credit Indemnity Co.*, 318 Pa. 160, 164. But there is an equally well-recognized limitation of this doctrine to the effect that "A principal can . . . ratify the unauthorized act of his agent without full knowledge of all material facts connected with it if he intentionally and deliberately does so, knowing that he does not possess such knowledge and does not care to make further inquiry into the matter": *Pollock v. Standard Steel Car Co.*, 230 Pa. 136, 141. It is inferred from a ratification under such circumstances that the principal is willing to assume the risk of facts as to which he knows he is ignorant. In the present case, when plaintiff wrote to Parrish: "That was all right about that American Can for Miss Yackey," he must have known that the risk he was taking depended upon the condition of her account and the value of her collateral. He could have sought information upon those matters before deciding whether or not to ratify; if he chose not to do so, he cannot now, upon that ground, repudiate his action.

Plaintiff alleges that he misunderstood the purport of the statement that Parrish had given to Geiger "my [Parrish's] guarantee." His contention that this was ambiguous is, in our opinion, wholly untenable. We cannot find in the letter any difficulty of construction which justified the trial judge in permitting plaintiff to testify as to his interpretation and in submitting to the jury the question of the reasonableness of such interpretation. We think that its language was plain, and that, therefore, as in the case of all written instruments, it

was the function of the court to declare and apply its meaning. We cannot understand how the words "Geiger has stated that he would deposit 50 shares of American Can stock of yours with them on my guarantee. This I have given him . . ." could reasonably be understood to mean that the guaranty was for the protection, not of Geiger's company, the defendant, but of plaintiff. To give someone a guaranty means, in ordinary English speech, to guarantee *that* person against something. "I gave A my guaranty" means that I guaranteed *A*, and it would take additional language to make it mean "I gave A. my guaranty *in favor of B*." Moreover, the concluding sentences of the letter: "I hope you will approve of what I did for Miss Yackey. I will take care of it *if you do not*," would have little, if any, meaning if plaintiff's interpretation were to be adopted, because, if Parrish were giving a guaranty to plaintiff, Parrish, not plaintiff, would be "taking care" of the transaction even if plaintiff *did* approve of it." * And yet Parrish's statement was that he, Parrish, would "take care of it" only if plaintiff did *not* approve, the necessary corollary being that if plaintiff *did* approve Parrish's responsibility would cease.

Several witnesses testified on behalf of defendant that after plaintiff's return from Europe he did not seek to revoke his ratification until just before the present suit was started, which was nearly six years later, but plaintiff insists that he made continued protests. This controversy is of no consequence. Since the ratification in his letter of April 11 was legally binding upon him he could not afterwards rescind it.

Judgment reversed and here entered for defendant.

Mr. Justice LINN did not participate in the decision of this case.

---

* There was no doubt as to Parrish's financial responsibility to honor his guaranty.