[Civ. No. 15268. First Dist., Div. One. Nov. 18, 1952.]

VIVIAN V. AXELL, Plaintiff and Appellant, v. EUGENE W. AXELL, Defendant and Appellant.

John Barton O'Brien and Herbert Chamberlin for Plaintiff and Appellant.

Hilary H. Crawford and Hilary H. Crawford, Jr., for Defendant and Appellant.

BRAY, J.—Plaintiff brought contempt proceedings against defendant for alleged failure to comply with the provisions of an interlocutory divorce entered in 1940, and a final decree entered in 1941. While cross-appeals were filed from the whole of the court's "Order Fixing Amount of Moneys Payable by Defendant Under Property Settlement Agreement and Decrees of Divorce," each party is questioning only certain portions of the order.

## QUESTIONS PRESENTED

1. The interpretation of the property settlement agreement and the decrees based thereon, particularly the meaning of "net profits" and whether income tax and agreed payments to plaintiff are deductible from gross receipts. 2. Is plaintiff barred by laches from claiming that income tax payments were excessive. 3. The character of certain payments to plaintiff claimed as "offsets" which the court found to be "gifts." 4. Is interest allowable?

## FACTS

The interlocutory decree of divorce granted plaintiff a divorce on the ground of cruelty, approved the property settlement agreement, and specifically ordered defendant to comply with its terms . (The final decree follows the terms of the interlocutory decree.) The terms important here follow: 1. Defendant was required to pay plaintiff for her support $100 per month and $25 per month for the support of their child. Defendant at all times has made these payments. In fact, after the child reached majority defendant continued the monthly $25 for almost one and a half years—an overpayment of $425. 2. Defendant was to pay all interest, taxes and insurance on the home ocupied by plaintiff until the present encumbrance was liquidated and thereafter and until plaintiff remarries, taxes and insurance only. Defendant met this requirement. 3. This is the crux of the appeals. De-

fendant, on January 15 in each year, *"in addition* to the payments to be made monthly to Wife, and *in addition* to the payments"* for the son, is required to furnish plaintiff a complete financial statement *"of all his assets and businesses"* and shall "pay to said Wife 25% of any and all *net profits* in excess of $4,800 net . . ." Defendant did not comply with any of these requirements. Although there were oral demands for a statement, plaintiff first made written demand in December, 1948. Defendant furnished no statement until thereafter. Defendent testified that this 25 per cent provision was intended to apply only to money that both had invested in a "seat adjuster" and from which they expected to make a lot of money. Plaintiff testified that there was no such understanding. (The court, in effect, found that "all his assets and businesses" meant more than the seat adjuster business.) In 1944 the money invested in that venture was lost. In August, 1941, defendant remarried. His new wife, Margaret, is an accountant, and during the marriage received a substantial income from her work as such and from other property she owns. Defendant entered into an agreement with Margaret that all her earnings should be her separate property. Prior to and at the time of the divorce, defendant was in the wholesale florist business. In January, 1942, Margaret went into partnership with defendant in that business, contributing $2,500 of her separate funds. In 1945 the business was taken over by a new partnership consisting of defendant's brother, who owned a half interest, defendant and Margaret, each owning a quarter. To this partnership Margaret contributed $7,500 of her separate funds, the brother $15,000, and defendant $7,500. The latter was money received by defendant from the business during 1944. Apparently the share of defendant and Margaret in the operating profits of the florist business has increased to 33 per cent each. In making income tax returns for 1943-47 (the court restricted the evidence to the period ending December 31, 1948), Margaret and defendant filed separate tax returns, each reporting one-half their combined incomes. In 1948 they filed joint returns. The result of splitting their joint incomes was that defendant's "net income" as shown on the returns was greater than his "net profits" from the business.

In determining "net profits" under the agreement and decrees the court took defendant's gross income from the

---

*All italics added unless otherwise noted.

business and deducted therefrom the federal and state income taxes paid by him. Plaintiff's appeal is based on her contention that this deduction was error. In any event, contends plaintiff, the amount deducted was too high. By adding together defendant's income which was only from the florist business and Margaret's income which from that business was equal in amount to that of defendant, and her separate income, and splitting the total in half, defendant was paying more tax than he would have paid had the tax been based solely on his income. In reaching the amount of which plaintiff is to receive 25 per cent, plaintiff's share is reduced improperly by deducting this larger sum from defendant's true income. In effect, says she, she is paying a portion of Margaret's income taxes. The court found that by failing to assert her rights until it was too late for defendant to be able to obtain a tax refund by filing returns limited to his actual income, plaintiff was guilty of laches and cannot now contest the method of computing his income tax adopted by defendant for the years in question.

Defendant's appeal is based on his contention that in arriving at his net profits, in addition to reduction for income tax he is entitled to have deducted the amounts paid plaintiff for alimony and child support, and certain sums hereafter discussed which the court found were gifts to plaintiff.

### 1. Interpretation of Agreement.

The agreement first states that defendant is annually to provide plaintiff with a statement of his "assets and businesses." It then provides that he is to pay her "25% of any and all net profits in excess of $4,800.00 *net* per annum, in addition to the payments to be made monthly to Wife, and in addition to the payments to be made to or for said minor son." A reasonable interpretation of the agreement is that he was to pay 25 per cent of the net profits (over $4,800) as shown on the statement of his *assets and businesses* (subject, of course, to a true statement being made). In construing the provision, the situation of the parties at the time of making the agreement must be considered. They owned a seat adjuster patent that both thought was going to make a lot of money. Had it done so, and had the agreement meant that defendant could not deduct income taxes to arrive at his net profits, defendant's share of his income, after paying plaintiff her 25 per cent, would be almost wholly eaten up by income taxes. The result then would be that plaintiff's 25 per cent

share would be much greater than defendant's 75 per cent share. Surely no such result could have been intended by the parties. Again at the time of the execution of the agreement, payments to the wife by way of alimony or property division were not subject to deduction by the husband, and therefore income tax on her share was payable by the husband. It could not have been contemplated that defendant was to pay plaintiff 25 per cent of the amounts he paid on her income tax.

The provision that the monthly payments for wife and son are to be in addition to her percentage of the net profits, coupled with the requirement that before she receives any of the net profits he is to receive $4,800 *net*, indicates that it was contemplated that the division of his income would be approximately one part to the wife and child and three parts to defendant. Thus, the wife was to get $1,200 for herself and the husband was entitled to $4,800 net to him, before she would be entitled to anything more. Also plaintiff was to receive interest, insurance and taxes on the home. The ratio between these figures is approximately one to three. After this ratio was met the same ratio would apply to the net profits over the $4,800 net to defendant, 25 per cent to plaintiff, 75 per cent to defendant—again one to three. Having in mind that the agreement was drawn by the attorney who represented plaintiff in the divorce, and therefore must be construed most strongly against her, there can be no other meaning ascribed to the phrase "$4,800 *net*." There must have been some reason for adding the *net* there. Were income taxes and the alimony not to be deducted from gross income the above-mentioned ratio would be badly disturbed. For example, if defendant's net income before taxes and payments to and for plaintiff only were considered in arriving at plaintiff's share, and if that net income for a particular year was only $6,000; defendant would be required to pay plaintiff 25 per cent of $1,200 ($6,000 minus $4,800) or $300. Thus plaintiff's receipts would total $1,500. Defendant however, would receive only $5,700 out of which he would have paid plaintiff $1,200 (he was required to pay plaintiff the $1,200 in any event, regardless of the amount of his income) which would have left him but $4,200 out of which he would still have to pay income taxes on $6,000. He also would have to pay plaintiff $300 for the child, plus insurance, etc., on the home. What then becomes of the provision that he is to have $4,800 *net* before he has to make any payments in addition to support? *Net* profits in excess of $4,800 *net* could only mean that from his state-

ment of assets and businesses there is to be a deduction of both income taxes and support liability before determining such net profits. A true annual statement of defendant's assets and businesses would necessarily include a statement of such fixed liabilities as income taxes and support moneys. The words in the agreement providing that the 25 per cent payment to plaintiff of net profits is to be ''in addition to'' the support payments, do not in anywise affect the method of determining what are the net profits. Those words apply to the requirement that regardless of his net income defendant is to pay plaintiff the agreed support, and then in addition a portion of the net profits if there are any over and above $4,800 *net* to defendant.

Definitions of ''net profits'' in a business such as are set forth in the cases cited by plaintiff, *Boradori* v. *Peterson,* 86 Cal.App. 753 [261 P. 520], *Nelson* v. *Abraham,* 29 Cal.2d 745 [177 P.2d 931], *Swerdfeger* v. *United Acceptance Corp.,* 9 Cal.App.2d 590 [50 P.2d 818], are not in point here. What are ''net profits'' depends greatly upon the circumstances of a particular case. Even accountant's definitions of the phrase are not necessarily applicable. What the parties clearly had in mind was not a technical definition but the net amount left after plaintiff had been paid taxes and interest on the home, the agreed support for herself and child (for herself alone after the child's minority should terminate), and after defendant had received his $4,800.

*2. Laches.*

 As before stated, the court found that because defendant could not obtain a tax refund from the government, plaintiff was guilty of laches in not asserting her claim earlier and could not now contest defendant's method of computing the taxes. We fail to find any support in the evidence for this finding. The method evolved by defendant and Margaret was one which reduced the total amount of taxes payable by both. Plaintiff had nothing to do with the establishment of this method. While defendant did not deduct from his income tax base the payments to plaintiff which he is now required to make under the 25 per cent clause, that fault was his. He deliberately failed and refused to perform his agreement. It was not until 1945 that his income was sufficient to require any percentage payment to plaintiff. He testified that ''probably two or three years after,'' in 1945 or 1946, plaintiff asked for a statement. Plaintiff testified that

she asked defendant for a statement year after year commencing the second year after the divorce and he would reply that "he didn't have the money" and "not to worry about it." She testified that she believed him. In view of the friendly relationship between the parties, her failure to assert her rights legally can hardly be held the cause of his failure to change his system of income tax returns. Nor in determining the amount of income tax reduction to be allowed in arriving at the percentage of the net profits to be awarded plaintiff is the trial court to permit a reduction from gross receipts of the amount *actually* paid by defendant to the government. The amount deductible is the amount of income tax which defendant would have paid, had he not added to his income any portion of Margaret's income.

### 3. *Gifts.*

In spite of the divorce and defendant's remarriage, the parties have remained friendly. In 1947 at plaintiff's request defendant expended $225 for painting portions of the house. Plaintiff testified defendant did this for the son at plaintiff's request. He also paid plaintiff $100 to build an additional room for the son. The agreement and decrees provided for payment of insurance only on the house. Defendant paid $127.79 in premiums for insurance on the furniture. In 1945, plaintiff received $150 from defendant for a trip to Minnesota. Defendant paid a total of $614.68 as premiums on insurance on plaintiff's car. Plaintiff testified that defendant paid them without asking her to do it, because the son used the car most of the time. In 1940 defendant bought plaintiff a Ford for $1,300. Later the car was sold, and defendant bought plaintiff a Pontiac, by adding $550 of his own money to that received from selling the Ford. Plaintiff testified that defendant had promised to buy her a car when they were divorced, and that she did not ask him to buy the cars. It was stipulated that for "his son and former wife" defendant bought tires costing $200. 1943 through 1947 defendant paid plaintiff's income taxes levied on her $100 per month alimony, totalling $728.18. December 11, 1947, plaintiff received $150 from defendant. It was "something extra." The total of these amounts plus the overpayment of support after the son's majority (he was then in the Navy) totalled $5,500.05. The court refused to allow them as "offsets" and found that they were gifts from defendant to plaintiff. Having in mind the well known rule that if the evidence, **or**

the reasonable inferences therefrom, support a finding, we are bound by it, we cannot say that the finding is erroneous. The defendant at no time testified that in making these payments he regarded them as payments on account nor did he testify that they were *not* gifts. He did not deny plaintiff's testimony as to the reasons the payments were made. Defendant at all times contended that the 25 per cent of the net profits he was to pay plaintiff referred only to the "seat adjuster" business. There were no profits from that venture. Moreover, the venture ended in 1944. Thus the payments could not have been made by defendant as offsets. Defendant contends that under the circumstances of this case there is no presumption of gift. Our case is unusual in the very friendly feeling that exists between the divorced parties. The circumstances of this case including the uncontradicted testimony of plaintiff are sufficient to justify the finding of gift.

*4. Interest.*

No attack is made on the correctness of the court's finding as to the yearly net profits other than as it is affected by the questions herein discussed. The court found that defendant owed plaintiff nothing for the years preceding 1945. For that year it found $2,729.36 due, for 1946, $1,389.87, for 1947, $1,455.18, for 1948, $374.03, a total of $5,948.44. It awarded 7 per cent interest on the amount found due in each year, starting the interest from January 15 of that year, and allowing interest only to January 15, 1950.

Defendant contends that no interest at all should be permitted as the indebtedness was unliquidated until the court made its determination and hence interest should run only from judgment. Defendant points out that in any event, the allowance of interest from January 15 of the year in which the indebtedness occurred, is erroneous. Obviously, until the year was over the net profits of that year could not be determined. Plaintiff concedes this error but contends it is more than offset by the fact that the court stopped the interest on January 15, 1950, instead of allowing it to continue until judgment.

"The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon." (Civ. Code, § 3302.) "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and

the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . .'' (Civ. Code, § 3287.) *Lineman* v. *Schmid,* 32 Cal. 2d 204 [195 P.2d 408, 4 A.L.R.2d 1380], traces the history of the application of section 3287 in determining when interest is allowable for breach of contract, reviews many cases on the subject, and approves the rule as stated in *Cox* v. *McLaughlin,* 76 Cal. 60 [18 P. 100, 9 Am.St.Rep. 164], saying: ''In that case liquidated damages were defined as those which were certain by computation from the face of the contract, or which might be made certain by reference to well-established market values plus computation. If damages were not susceptible of ascertainment, either by computation from the contract or from established market rates, intest was not allowable until the amount due had been determined by judicial process.'' (Pp. 209-210.) The court quoted the rule as stated in Restatement of the Law of Contracts, section 337 (a), which rule is practically the same as that set forth in the Cox case. Our problem, then, is to determine whether the amounts payable to plaintiff were certain by computation from the face of the contract or whether they had to be determined by judicial process. Plaintiff was to receive a proportion of the net profits.　　The contract provides no measure for determining what items were deductible from the gross income to arrive at the net profits. In view of the uncertainty of that factor which required determination by the judicial process it must be held that the amounts due plaintiff were unliquidated, in the sense that they could not be determined until a court clarified the uncertainty in the contract. Therefore, as the claims were unliquidated, interest would run only from judgment.

### FORM OF ORDER

In her closing brief plaintiff contends that the court in this contempt proceeding in effect modified the interlocutory and final decrees which it had no power to do. The order does not have that effect. In arriving at the question of whether defendant had complied with those decrees it became necessary for the court to construe them and the agreement upon which they are based. This the court did. It was stipulated at the hearing that the proceeding was essentially one for an accounting and that the order should be one finding the amount due rather than the usual contempt order.

The order is affirmed as to the provision finding that the sums totalling $5,500.05 were gifts and disallowing them as

offsets. In all other respects the order is reversed with instructions to the trial court to take additional evidence and make new findings and order as herein set forth. Plaintiff is awarded costs.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied December 18, 1952, and defendant and appellant's petition for a hearing by the Supreme Court was denied January 15, 1953. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.