## Maguire, Appellant, *v.* Osborne.

Argued November 25, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Dunstan McNichol,* for appellant.

*Floyd W. Tompkins,* with him *James A. Peace* and *Tompkins & McNally,* for appellees.

OPINION BY MR. JUSTICE JONES, March 13, 1956:

The plaintiff, acting individually and as the administratrix of her deceased husband's estate, filed her complaint in equity as a minority stockholder of the Fibreflex Packing and Manufacturing Co., Inc., a Pennsylvania corporation, against Arthur Osborne, the majority stockholder, Charles A. Hofmann and Joseph C. Hofmann, Jr., employees and directors, and the cor-

poration itself, seeking a decree to compel the Hofmanns to return to the corporation certain moneys received by them as additional compensation, under a written agreement with the corporation, in an aggregate amount which the plaintiff alleges was excessive and unconscionable. The defendants filed a joint answer. After hearing, the learned chancellor filed an adjudication containing findings of fact, conclusions of law and a decree *nisi* dismissing the plaintiff's complaint at her costs. Extensive exceptions by the plaintiff to the adjudication and decree *nisi* were, after argument, dismissed by the court en banc which thereupon entered a consonant final decree.

The plaintiff has taken but one appeal, as an individual and as administratrix of her deceased husband's estate, although such interests are not joint: see *Dublin Estate*, 375 Pa. 599, 600-601, 101 A. 2d 731. We shall enter a *non pros* as to the plaintiff individually, leaving the appeal as that of the administratrix. The record shows that the Fibreflex stock which Mrs. Maguire represents is an asset of her husband's estate and has never been decreed to her individually. Her election as a director of the corporation has at all times been as administratrix of her husband's estate and it is in that capacity that she has attended directors' and stockholders' meetings.

The findings of the learned chancellor are supported by substantial evidence and, having been confirmed by the court en banc, are binding here.

The principal question of law involved is as to the intended meaning of the term "net profits" where used in the written agreements between the corporation and the Hofmanns providing for extra compensation to the latter.

For a proper understanding of the controversy and the chancellor's treatment of the plaintiff's contentions,

a recital of some of the established facts is necessary. The findings reveal an amazing financial success evolved out of a practically defunct company through the ability, industry and faithful service of the defendants Hofmann whom the plaintiff would now deprive of the additional compensation to which they became entitled under their written agreements with the company and whereof the plaintiff long had full knowledge and made no complaint.

Fibreflex Packing and Manufacturing Co., Inc., had a capital of $2,000 represented by forty shares of stock of $50 par value each. From a time prior to 1941, Mrs. Scheer, an aunt of defendant Osborne, had been the owner of the whole of the company's capital stock. The plaintiff's decedent, Lawrence Houston Maguire, was then in charge of the business for Mrs. Scheer. In 1941, in recognition of his services, she gave him twelve shares or thirty per cent of the stock of the company. Maguire died March 3, 1946. By that time he was practically the only employee of the company, its business having dwindled to such an extent that the company was verging on insolvency, if not then actually insolvent. It had operated at a net loss for the seven preceding years and, at the time of Maguire's death, it was unable to meet its debts as they matured. It would seem that the company's capital was then impaired, indicating that its assets were somewhat less than its liabilities. At least, this is confirmed inferentially by the fact that Mrs. Maguire, as administratrix of her husband's estate, had his twelve shares of Fibreflex stock appraised as of the date of his death at a total value of $480, or $10 per share less than par. For inheritance tax purposes the value was fixed at $450. And, no one has suggested that either appraisal was an undervaluation.

Following Mr. Maguire's death in March of 1946, Mrs. Scheer, who was president of Fibreflex, called on her nephew, the defendant Osborne, for advice concerning the company's future, which to Osborne looked hopeless. Together, Mrs. Scheer and Osborne conferred with the Hofmanns with a view to having them take over the management and operation of the business—a relationship soon thereafter consummated. By March of 1947, it was apparent from the current increase in net earnings over the previous years that, under the Hofmanns' management and personal services, the prospects for the company's success were good. As an inducement to the Hofmanns, and another employee named Gray, to remain with the company and devote their time and energy to the promotion of its business, the company entered into a written agreement with them on March 25, 1947, whereby it was agreed that one-half of the net profits of the company from January 1, 1947, until the termination of the agreement should be paid to the Hofmanns and Gray in specified proportions as compensation.

Mrs. Scheer, who, as president, had executed the agreement of March 25, 1947, in behalf of the company, died in July 1947, and her nephew, Osborne, became the owner of her twenty-eight shares of Fibreflex stock which represented a seventy per cent interest in the company. The management contract of March 25, 1947, was modified by a further agreement on January 1, 1948, between the company and the Hofmanns, Gray no longer being a party. Stated salaries to the Hofmanns in the January 1, 1948, agreement were fixed at $3,900 per year to Charles A. Hofmann, as general manager, and $1,040 a year to Joseph C. Hofmann, Jr., as accountant; the provision for the payment to them of one-half of the net profits of the company as extra

compensation was continued. This agreement was ratified by the stockholders at their meeting on November 28, 1948, at which the plaintiff was present and voted in the affirmative after the agreement had actually been read to her. It was at the same meeting that the Hofmanns, to each of whom Osborne had assigned a share of Fibreflex stock for qualifying purposes, were first elected directors and executive officers of the corporation. Osborne had become the president after Mrs. Scheer's death and so remained throughout the subsequent times herein involved.

The management and compensation agreement of January 1, 1948, was amended on December 30, 1950, in a detail not presently material; and on March 13, 1951, it was extended to December 31, 1961, and for a possible additional period thereafter depending upon the happening of a specified contingency.

Mrs. Maguire, the plaintiff, was elected a director of Fibreflex Company on November 18, 1950. From 1946 onward she had annually received financial statements of the company, showing the extra compensation paid the Hofmanns. These statements disclosed the method by which the fifty per cent share of the net profits, payable to the Hofmanns as extra compensation, was computed. Yet, she never made any objection thereto until October 23, 1952, and did not institute the present suit until November 18, 1953.

Under the Hofmanns' management, the company began in 1947 and 1948 to make money in modest amounts (there were no net profits in 1949) with the result that in 1951 and 1952 the company was able to, and did, pay dividends at the rate of $50 per share for each of those years, such dividends being the first ever paid in the history of the company. The $1,200 in dividends which the plaintiff received was, it may be observed,

two and one-half times the value at which she had had her husband's twelve shares appraised just several years before. Furthermore, at the trial of this case, which began in December 1953, the plaintiff's financial expert witness testified to a value for her twelve shares of stock in the Fibreflex Company of from $120,-000 to $125,000.

In view of the company's fairy-like financial achievement, the chancellor's estimate of the value of the Hofmanns' services to the Fibreflex Company becomes readily understandable. Thus the chancellor found and the evidence well supports the findings: "19. While the Hofmanns managed the corporation it enjoyed a phenomenal growth; this growth was due entirely to the industry, skill and efforts of the Hofmanns. 20. During the early years, the Hofmanns performed managerial, manual and menial labors, including truck driving and duty as night watchman. 21. From March, 1946, to December, 1952 the net worth of the corporation increased from $16,360 to $91,256.74; assets rose from $22,965.48 to $238,993.19; gross sales from $97,602.73 in 1947, to $582,574.69 in 1952 and $546,950.40 in 1953. . . . 31. Under the Hofmann's management Fibreflex's success has forced their four principal competitors out of the field; Fibreflex is the largest producer of vegetable fibre sheet in the industry. 32. The success of Fibreflex was due solely to the extraordinary efforts and abilities of the Hofmanns. 33. The monies paid to the Hofmanns were not a bonus, but were additional compensation for services performed." While Arthur Osborne, the seventy per cent owner of the company, was on the witness stand during the trial, relating in detail the great service the Hofmanns had rendered Fibreflex, the learned chancellor was moved to interpolate, "That sounds like an epic

to me" and the witness responded, "It is. It is a miracle."

So satisfied was Arthur Osborne with the arrangement for the Hofmanns' services that on November 29, 1949, he personally entered into an agreement with them whereby he placed in escrow twenty-one of his twenty-eight shares of Fibreflex to be delivered unconditionally and absolutely to the Hofmann brothers on June 30, 1957. The recited consideration for this agreement was a loan of $5,000 to the corporation by Charles A. Hofmann who thus demonstrated his faith in the company by which he was employed. At that time, i.e., near the close of the year (1949), it was known that no profits had been made and, of course, no extra compensation had been paid the Hofmanns.

In considering the legal aspects of the controversy, it is to be borne in mind that the appellant does not attack the validity of the compensation agreement between Fibreflex and the Hofmanns. Nor does she charge a breach of fiduciary duty by anyone acting for the company in such connection. The fact is that when the controlling and still extant compensation agreement of January 1, 1948, was entered into, the Hofmanns were but employees of Fibreflex at extremely minimal salaries. It was not until almost a year later (viz., November 28, 1948) that the Hofmanns became directors of the company, being stockholders then only to the extent of one share each which Arthur Osborne (retaining the beneficial interest therein) caused to be transferred to them for qualifying purposes.

It is the appellant's contention that the term "net profits" as used in the compensation agreement means the company's net profits after payment of Federal income and excess profits taxes and the State corporate net income tax.

In the court below the plaintiff had argued that the term "net profits" was ambiguous and required judicial construction. The learned chancellor held, however, that net profits, as used in the compensation agreement, meant the balance of the gross income remaining after deducting therefrom operating business expenses and before payment of taxes on the net income. Here, the appellant has altered her position and now contends that net profits is a term of art with a definite meaning in the law that it embraces so much of a company's net earnings as remain after payment of the income and profits taxes thereon.

As a term of art, net profits may mean two different things, depending upon its contextual relation. If the term is used for the determination of the amount of a liability for a business expense, such as compensation to employees, it necessarily means net profits before the payment of income and profits taxes. Such taxes are assessed only on net income after deduction of all operating expenses; necessarily, therefore, a portion of net profits payable to employees as compensation (viz., a business expense) must be determined and deducted before the net income subject to tax can be ascertained. If, however, the term net profits is intended to define the earnings available for distribution among stockholders by way of dividends or for allocation to earned surplus, it means the net profits after the payment of the taxes on the ascertained amount of the net income subject to tax.

It follows, therefore, that the term "net profits", as used in the compensation agreement between Fibreflex and the Hofmanns means the net profits before payment of taxes. As observed in *Gallen v. National City Bank of New York*, 273 N.Y.S. 87, 113,—"No question is raised in the books but that a corporate officer [here employee] may be paid a percentage of profits

. . . and that such compensation, contingent upon net earnings, is a cost of the enterprise and not a distribution of funds exclusively allocated to stockholders."

What the law thus ascribes as the meaning of the term "net profits", in relation to the provisions of the compensation agreement, is exactly what the parties intended it to mean. The agreement itself inherently so confirms. It provides that "The said one-half of the net profits payable by 'Corporation' [Fibreflex] to 'Employees' [Hofmanns] shall be paid to them upon the following terms and conditions: (a) Said net profits shall be paid to 'Employees' quarterly commencing the first day of April, 1948, . . . ." This provision negatives any idea that deduction for corporate income and profits taxes could have been in the thinking of the parties at the time of the execution of the contract. Such taxes are assessed on the net income from *a year's* operation. How then, it may be asked, could deduction for income and profits taxes be made from a quarter's earnings when, by the end of the tax year, there might not be any liability for such taxes because of the counterbalancing effect of losses in a subsequent quarter of the year.

If there was any doubt as to the meaning of the January 1, 1948, agreement, the parties' uniform and unvarying interpretation of it over the years confirms that the net profits, whereof the Hofmanns were to receive fifty per cent, embraced the profits before taxes. The general rule of interpretation, pertinent to the present circumstances, is well stated in 56 Corpus Juris Secundum, §112, p. 547, as follows: "Under an agreement by which profits from the employer's business are to be included as a basis for compensation, the amount recoverable by the employee depends on the intention of the parties as revealed in the contract and *by their conduct under it"* (Emphasis supplied). It

has long been established in this State that, where a contract is susceptible of two different interpretations, the one that the parties themselves put upon it is the one that the courts will adopt and enforce. In *Gass Appeal*, 73 Pa. 39, 46, Mr. Justice Agnew said that "when a contract is capable of two different interpretations, that which the parties themselves have always put upon it, and acted upon, especially as here for a long series of years, a court will follow, because it is the true intent and meaning of the parties . . . ." That statement has since been cited and applied a number of times down to *Foulke v. Miller*, 381 Pa. 587, 595, 112 A. 2d 124; see, also, Restatement, Contracts, §235 (e).

The appellant's further contention is that the extra compensation paid the Hofmanns for the years 1950, 1951 and 1952 was excessive and unconscionable. She is plainly without standing to so assert. In any event, the alleged excessiveness of the contractually obligated compensation does not go to the intent of the 1948 agreement which, after all, is the appellant's only question of any substance. For the years 1947 and 1948, when the company's profits were relatively small and the Hofmanns' extra compensation, under the agreements, proportionately likewise (there were no profits at all in 1949), the plaintiff made no complaint whatever of the extra compensation then paid to the Hofmanns. Indeed, even now, the appellant does not contest the extra compensation paid the Hofmanns prior to 1950. She states in her brief that "the question of reasonableness applies only to 1950 and subsequent years. Amounts paid prior to 1950 were small . . . and their reasonableness is not questioned . . . ." Nonetheless, such amounts were paid under the compensation agreements on the "net profits" before taxes. The appellant is therefore estopped to raise an issue as to the

quantum of the extra compensation payable in 1950 and thereafter under the 1948 agreement when she did not object to the extra compensation paid under the same agreement prior to 1950.

Moreover, the appellant is guilty of laches. Not only did she willingly acquiesce in the company's acceptance of the Hofmanns' managerial and laborious services in the first three years of the compensation agreement but for almost three years more she stood by and enjoyed the benefit of their employment with the result that the value of her capital interest in the company was, within six short years, multiplied two hundred and fifty times on the basis of the value testified to by her own expert witness at trial. If she were now permitted to deprive the Hofmanns of the compensation to which they are entitled under the 1948 agreement, the time and energy which they faithfully and unstintingly devoted to the company's welfare and success could never be restored to them. A plainer case for the application of the doctrine of laches could hardly be imagined. The learned court below was, therefore, warranted in dismissing the plaintiff's complaint on the additional ground of laches: see *Grange National Bank of McKean County v. First National Bank of Bradford*, 330 Pa. 1, 3-4, 198 A. 321.

In conclusion, we cannot refrain from echoing the learned chancellor's comment that "plaintiff's charge that [the Hofmanns] were 'milking' the corporation is unrealistic and comes with ill-grace."

The appeal of the plaintiff individually is *non prossed.* Decree affirmed at appellant's costs.

DISSENTING OPINION BY MR. JUSTICE BELL:

The majority opinion gives, unintentionally of course, a completely distorted picture of the facts, and consequently reaches an unjustifiable conclusion.

442

Lawrence H. Maguire, husband of the plaintiff, was manager of the business of Fibreflex Packing and Manufacturing Co. At his death on March 3, 1946, he owned 12 shares of Fibreflex stock which he left to plaintiff. The stock was then appraised at $450. The corporation had outstanding 40 shares of stock of which Mrs. Scheer owned 28 shares. Mrs. Scheer died in July, 1947, and her nephew, Arthur Osborne, became the owner of her 70% stock interest as well as President of the Company.

Charles A. Hofmann, one of the defendants, took over the management of Fibreflex in 1946 at a salary of $3900. a year. Joseph Hofmann was employed as an accountant at a salary of $1040. a year. On November 28, 1948, Charles Hofmann became Vice President, Treasurer, General Manager and a director of Fibreflex and Joseph Hofmann, the other defendant, became Secretary and a director. Plaintiff became a director on November 18, 1950, in place of Mrs. Osborne. Under the Hofmann management, the Company made no profit in 1946 and 1947, practically none in 1948 and none in 1949.

On January 1, 1948, a second management agreement[1] was made between the corporation and the Hofmanns *for a four year period.* Charles Hofmann was employed thereunder as General Manager at $3900. a

---

[1] It is unnecessary to mention the first management agreement of 1947 since its only relevancy would be to point out that the Hofmanns deprived the other employes of Fibreflex, just as they deprived under the amendment to the second agreement, all other employes of Fibreflex of the "additional compensation" to which they were entitled by the express terms of the agreements. The Resolution which was adopted at a Directors' Meeting of Fibreflex on December 30, 1950, at which the Hofmanns and Osborne were the only directors present, provided that all employes except the Hofmanns should, in Hofmann's discretion, be excluded from sharing in the additional compensation.

year and Joseph Hofmann as accountant at $1040. a year. In addition to the salary, one-half of the "net profits" of the corporation was to be paid quarterly, 40% thereof to Charles and 20% thereof to Joseph, and the remaining 40% to other employes in such proportion as Charles Hofmann should decide. No one except the Hofmanns ever received any payments under this agreement.[1] The contract was approved by the stockholders on *November 28, 1948;* plaintiff was present at this meeting, but was not given a copy of the management agreement, although she requested it.

On *November 29, 1948*—obviously as part and parcel of their election as officers and directors and the approval of their management agreement the previous day—the Hofmanns entered into a written agreement with Osborne (owner of 28 shares of Fibreflex stock) to subsequently loan to the corporation $5,000., in consideration of which Osborne and the corporation agreed to *immediately* deliver to the Hofmanns' attorney (Tompkins) a certificate for twenty-one (21) shares of corporation stock presently owned by Osborne. These twenty-one (21) shares were to be registered upon the books of the Corporation in the names of Charles A. Hofmann and Joseph C. Hofmann, Jr., as joint tenants with a right of survivorship, the shares to be held in escrow by Tompkins until the 30th day of June, 1957,

---

[1] It is unnecessary to mention the first management agreement of 1947 since its only relevancy would be to point out that the Hofmanns deprived the other employes of Fibreflex, just as they deprived under the amendment to the second agreement, all other employes of Fibreflex of the "additional compensation" to which they were entitled by the express terms of the agreements. The Resolution which was adopted at a Directors' Meeting of Fibreflex on December 30, 1950, at which the Hofmanns and Osborne were the only directors present, provided that all employes except the Hofmanns should, in Hofmann's discretion, be excluded from sharing in the additional compensation.

on which date the stock certificate for 21 shares was to be delivered *unconditionally* to the Hofmanns or the survivor of them as the *sole and absolute owners thereof*.

The above mentioned second management agreement dated January 1, 1948 was made by the Hofmanns as employes on the one hand and by Fibreflex by its President, Osborne, attested by Hofmann, Secretary, on the other hand. This agreement was not an every-day business transaction but a contract which was so unusual and extraordinary and of such a special character that it would naturally call for express authority from the Board of Directors or ratification thereof by the Board or by the stockholders. The President was only the agent of the Corporation, and the Hofmanns, who seek to charge the Corporation, must prove that the agent had express, implied or apparent authority to make the contract in question: *Paper Mill Supply Co. v. Container Corporation*, 301 Pa. 62, 67, 151 A. 588. However, the stockholders at a meeting on November 28, 1948 "affirmed the 2nd management agreement as per copy attached". The agreement of January 1, 1948 was therefore ratified and validated by the above mentioned approval of the stockholders.

A third Hofmann management agreement was entered into on March 13, 1951 which, as we shall see, was illegal. On that date the Hofmanns' profit-sharing agreement of January 1, 1948, which by its terms expired on December 31, 1951, was extended to December 31, 1961. The agreement was executed by Osborne, President, attested by Joseph C. Hofmann, Jr. as Secretary, on the one hand, and by Charles A. Hofmann and Joseph C. Hofmann, Jr. on the other hand. On the date of this agreement, the Hofmanns were not only two of the four directors, but were also **Vice President,**

Treasurer, Secretary and General Manager of the Corporation, as well as the registered and equitable owners of 52% of the corporate stock. It cannot be gainsaid or controverted that this agreement was made by the Hofmanns with themselves. Furthermore, and even more important, such a contract was beyond the actual or apparent authority of the President and the Secretary (Joseph C. Hofmann, Jr.) of Fibreflex, and, not having been approved by the directors or by the stockholders, was voidable. It is clear that the additional compensation or net profits which the Hofmanns paid themselves thereafter and thereunder was not only so excessive and unconscionable as to make it voidable, but was likewise without authority and therefore void.

The Hofmanns, not content with giving themselves one-half of the net profits in addition to their salaries, computed (what they term) their additional compensation, by taking 50% of the corporate profits, *before* instead of *after* taxes. These taxes include Federal Corporation Income and Excess Profits Taxes, Pennsylvania Corporate Net Income Taxes, Capital Stock Taxes and Corporate Loans Taxes.

This additional compensation which the Hofmanns claim they are entitled to receive, based on net profits *before* taxes, is as follows:

|      | C. A. Hofmann | J. C. Hofmann, Jr. |
|------|---------------|--------------------|
| 1948 | $ 3,133.91    | $ 1,566.96         |
| 1949 | none          | none               |
| 1950 | 32,036.07     | 16,018.03          |
| 1951 | 57,094.12     | 28,547.06          |
| 1952 | 37,730.62     | 18,865.31          |
| 1953 | 30,514.52     | 14,347.25          |

After payment of this so-called additional compensation, amounts were paid into surplus as follows:

| 1948 | $ 3,409.52 |

| | |
|------|-----------|
| 1949 | none |
| 1950 | 34,341.04 |
| 1951 | 31,015.44 |
| 1952 | 22,217.66 |
| 1953 | 19,340.10 |

The only dividends declared by Fibreflex in the eight years in which the Hofmanns managed the Company were declared on January 26, *1953,* out of 1951 profits, and in October, 1953, out of 1952 profits, and totaled $4000., of which the plaintiff received the munificent total sum of $1200.

It is clear that the Hofmanns in this tiny corporation in which they were Vice President, Secretary, Treasurer, General Manager, and two out of the four Directors of Fibreflex, as well as the registered and real owners of over 50% of the stock, made (with Osborne's assistance) on *March 13, 1951, an agreement with themselves* under which they paid themselves in this three year period (1951-53) fixed salaries of $14,820. cash, plus a total additional sum of $187,097 cash,[2] while the owner of 30% of the stock of the Corporation received $1200. Where a director enters into a contract with his corporation, the burden is on him to show that the contract was fair and reasonable and was not injurious to the corporation or its stockholders. Defendants attempt to excuse and justify these unconscionable payments by pointing out that the book value of plaintiff's stock increased to $120,000. However, both they and the majority signally failed to point out that the book value of the Hofmanns' 52-1/2% stock interest increased from 0 to $210,000. Defendants seem to forget

---

[2] Under the eight years of Hofmann management they received salaries totaling $29,640. and additional compensation of $239,853. cash, while all of the stockholders received $4,000. of which plaintiff's share was $1,200.

that you can't live on book value; even a widow who is a mere stockholder can't live on $150. a year. It may not be amiss to ask: Could any agreement have been more unfair and unconscionable? While it is true that the Hofmanns "made" the Corporation, isn't it equally true that they "milked" the Corporation?

. Justice JONES, in *Weissman. v. Weissman, Inc.,* 374 Pa. 470, 474-5, 97 A. 2d 870, speaking for a unanimous Court, said: "In Lutherland, Inc. v. Dahlen, 357 Pa. 143, 151, 53 A. 2d 143, we recognized that officers of a corporation 'must devote themselves to the corporate affairs *with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal prof: it or advantage* [3] other than that enjoyed by their fellow shareholders: [citing cases]. In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction. Nor is it material that his dealings may not have caused a loss or been harmful to the corporation; *the test of his liability is whether he has unjustly gained enrichment.'* [4] See also §196, Restatement, Restitution, p. 804." Under the principle set forth in that case (which was cited with approval in *Weissman v. Weissman, Inc.,* 382 Pa. 189, 114 A. 2d 797, on pp. 192-193), defendants are certainly not entitled to any part of the $187,097. which they claim as net profits of the corporation for 1951-1953.

_____

[3] Italics, ours.

[4] Italics, ours.

448

The majority opinion states that plaintiff is estopped to assert her claim at this late date because from 1946 onward she had annually received financial statements of the corporation showing the extra compensation paid the Hofmanns and these showed how the 50% share of the net profits was computed. Let's analyze how accurate that statement is. *In 1946 and in 1947 and in 1949, the Company made no profits. In 1948 the profits were tiny.* The record shows that financial statements were sent by the corporation to plaintiff commencing November 28, 1948. Plaintiff in December, 1948, requested permission to examine Fibreflex books "for claims which she thought she might have against the Company". In October, 1952, plaintiff's attorney wrote to defendants and made various demands which were rejected. The complete and conclusive answer to the alleged estoppel is (a) no rights of other parties have intervened; (b) defendants have not pleaded laches or estoppel; and (c) there cannot be ratification without full knowledge of all the material facts. *Todd v. Skelly,* 384 Pa. 423, 120 A. 2d 906; *E. Girard Sav. & Loan Assn. v. Houlihan,* 373 Pa. 578, 97 A. 2d 23; *Fishman v. Davidson,* 369 Pa. 39, 85 A. 2d 34 (1951); *Schwartz v. Mahoning Val. Country Club,* 382 Pa. 138, 114 A. 2d 78 (1955); *Currie v. Land Title Bk. & Tr. Co.,* 333 Pa. 310, 5 A. 2d 168 (1939); *Kelly, Murray, Inc. v. L. B. & T. Co.,* 299 Pa. 236, 149 A. 190 (1930); 2 American Jurisprudence, §350.

Moreover, if Judges cannot agree on what is an illegal corporation agreement, and what is meant by the term "net profits", how could an inexperienced woman, ignorant of business and of tax and legal affairs, know she was being deprived and defrauded of her rights (1) by an officers-directors' agreement which was illegal and (2) by an interpretation of language

("net profits") which must have been Greek to her?

Claims similar to those made by these defendants— but not nearly as outrageous—have been summarily rejected whenever they have arisen in other States (1) because of the conflicting interest of the Hofmanns and the unconscionable agreement they made with themselves on March 13, 1951; and (2) because the words "net profits" were construed to mean what I believe they always have meant and were intended to mean, unless clearly otherwise provided, namely, net profits *after* payment of operating costs, business expenses and taxes. How can you possibly know whether you have a "net profit" until you know what taxes you have to pay? [5]

The effect of taxes upon the net operating income or profit of a corporation is so tremendous and so much a part of the thinking of all persons who are involved in the management or directorship of a corporation, that when the term "net profits" is used by persons who are directors or who are engaged in the management of a corporation, they undoubtedly mean profits remaining *after* taxes, unless a contrary intent is clearly stated.

In *Neeson v. Sangamon County Mining Co.*, 316 Ill. 397, 147 N.E. 369 (1925) plaintiff filed a bill for accounting to ascertain the amount of money due him under a written contract of employment in which he was to receive "5% of the net profits" of the Company. The Court held that the net profits were to be determined by deducting from the gross receipts total ex-

---

[5] The majority opinion states that the agreement provided for quarterly payments, but fails to point out that the agreement further provides that if a loss is sustained in any quarter all quarterly losses must be made up before there can be any further distribution of net profits.

penditures of *and all taxes* paid by the Company.

*Fleischer v. Pelton Steel Co.,* 183 Wis. 451, 198 N.W. 444 (1924) was another case dealing with payment of additional compensation to a valuable employe. The resolution of the Board of Directors provided that he should receive over and above his regular salary 5% of the "net earnings" of the Company; and defined the term "net earnings" as being profits after, inter alia, all expenses incident to operation of the plant have been paid. Nevertheless, the Court held that the Company had no net earnings *until the tax liabilities were deducted and paid.*

In *Swaller v. Williamson Milling Co.,* 116 Kan. 329, 226 Pac. 1001 (1924), the contract with plaintiff-employe provided that plaintiff was to get a certain portion of the "excess earnings" of the Company. This agreement specified certain deductions for operating business expenses before there would be excess earnings. Nevertheless, the Court held that the federal income tax was an operating business expense.

In *Axell v. Axell,* 114 Cal. App. 2d, 248, 250 P. 2d 182 (1952), the question involved the proper interpretation of a final divorce decree which directed the husband to pay his wife 25% of any and all "net profits" in excess of $4800. In determining net profits, the Court deducted from the husband's gross income, the federal and state income taxes paid by him.

*Lowenstein v. Bechtold Co.,* 326 Mo. 1089, 246 S.W. 2d 780 (1952) likewise dealt with the interpretation of the words "net profits". The plaintiff-lessor in that case sought a declaratory judgment which would interpret the words "net profits" as used in the lease to mean profits *before* deduction of income taxes. The Court held this contention was devoid of merit and decreed that the term "net profits" meant profits *after*

income taxes. The opinion noted that there are many cases containing observations that federal income and excess profits taxes are generally considered as operating expenses of business.

Compare also, *Sheasley Trust,* 366 Pa. 316, 77 A. 2d 448, where Justice, now Chief Justice, STERN said (p. 320): "The trustees were to pay to the settlor's children the net income or profits derived from the property. The 'net income' of real estate is only that portion which remains *after* the payment of taxes, repairs and commissions, . . ."

To summarize: I would hold that the Hofmanns were entitled (1) to their salaries each year in question and (2) to 50% of the net profits *after* taxes for the years 1947, 1948, 1949 and 1950. I would further hold the Hofmanns were not entitled to any net profits for the years 1951 to 1953 inclusive because the agreement they, as directors and officers, made with themselves as individuals on March 13, 1951, was so unconscionable as to be voidable, and (b) being beyond the actual or apparent authority of the President and Secretary of the Corporation and never having been approved or ratified by the stockholders or directors was voidable or void.